No. 22-35104

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

In re:  GIGA WATT, INC., a Washington corporation,

*Debtor.*

MARK D. WALDRON, Chapter 7 Trustee,

*Appellee,*

v.

PERKINS COIE LLP, a Washington limited liability partnership, and
LOWELL NESS, individual and California resident,

*Appellants,* and

GIGA WATT PTE., LTD., a Singapore corporation, and ANDREW
KUZENNY, a citizen of the Russian Federation,

*Defendants*.

APPEAL FROM UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON
No. 2:21-cv-00159-SAB; Honorable Stanley A. Bastian

**APPELLANTS' OPENING BRIEF – <u>REDACTED</u>**

Bradley S. Keller,
WSBA No. 10665
Ralph E. Cromwell, Jr.,
WSBA No. 11784
Jofrey M. McWilliam,
WSBA No. 28441
BYRNES KELLER
CROMWELL LLP
1000 Second Ave., Ste. 3800
Seattle, Washington  98104
Telephone: (206) 622-2000

John Munding,
WSBA No. 21734
MUNDING, P.S.
9425 N. Nevada St. Suite 212
Spokane, Washington  99218
Telephone:  (509)-624-6464

Michael B. King,
WSBA No. 14405
Jason W. Anderson,
WSBA No. 30512
CARNEY BADLEY
SPELLMAN, P.S.
701 Fifth Avenue, Suite 3600
Seattle, Washington  98104
Telephone: (206) 622-8020

**Rule 26.1**

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1, appellants state that defendant Perkins Coie LLP is not a publicly traded entity and has no parent corporation that is publicly traded or that is owned by a public corporation owning ten percent or more of its stock.

///

///

///

///

i

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .......................................................... ii

I.     STATEMENT OF JURISDICTION ............................................1

II.    STATEMENT OF ISSUES AND STANDARD OF REVIEW......................2

     A.     Overview. .....................................................................2

     B.     Issues Presented.............................................................4

     C.     Standard of Review. .......................................................6

III.    STATEMENT OF THE CASE .................................................7

     A.     The Giga Watt Project.....................................................7

     B.     The "White Paper" and the WTT Token Purchase Agreements...........9

     C.     The Trustee Seeks to Enforce the Token Purchase Agreements Against Perkins...................................................11

     D.     The Token Purchase Agreements Require Arbitration of Disputes. ...............................................................16

     E.     Proceedings Below. .......................................................17

     F.     Related Proceedings. ......................................................21

IV.    SUMMARY OF ARGUMENT.................................................22

V.     ARGUMENT...................................................................28

     A.     Arbitration Is Required Under Ordinary Estoppel and Agency Principles, and the Bankruptcy and District Courts Erred in Concluding Otherwise..............................................28

          1.     Ordinary Estoppel and Agency Principles Apply to Determine Arbitrability Under the New York Convention. ...................................................29

**Page**

      2.    Ordinary Estoppel Principles Require Arbitration of This Dispute. ...................................................................30

          (a)    The Trustee is asserting the contractual rights and liabilities of GW Singapore. ...........................................32

          (b)    The Trustee's claims against Perkins are inextricably intertwined with, and dependent upon, the terms, performance, and breach of the Token Purchase Agreements, which contain the arbitration clause. ...........................................................34

          (c)    The Trustee may not assert rights under the Token Purchase Agreements by asserting that Perkins caused a breach of those Agreements resulting in liability and damages under those Agreements, without also being subject to all of the terms of those Agreements—including, specifically, that disputes arising from or relating to the Agreements be arbitrated in Singapore. ...............................39

      3.    Ordinary Agency Principles Also Require Referral to Arbitration. ...............................................................43

   B.    The Bankruptcy Court Erred in Denying Perkins' Motion to Compel Arbitration, and the District Court Erred in Affirming that Decision. ...........................................................45

VI.   CONCLUSION ...............................................................50

CERTIFICATE OF COMPLIANCE ...........................................52

# TABLE OF AUTHORITIES

**CASES** Page(s)

*American Title Insurance Co. v. Lacelaw Corp.*,
  861 F.2d 224 (9th Cir. 1988) ............................................................ 27, 49

*Amisil Holdings, Ltd. v. Clarion Capital Managment*,
  622 F. Supp. 2d 825 (N.D. Cal. 2007) ...................................... 5, 26, 44

*Arthur Andersen LLP v. Carlisle*,
  556 U.S. 624 (2009) ...................................................................... 30

*Avila Group, Inc. v. Norma J. of California*,
  426 F. Supp. 537 (S.D.N.Y. 1977) ................................................ 41

*Balen v. Holland America Line Inc.*,
  583 F.3d 647 (9th Cir. 2009) ................................................ 18, 29

*Barnett v. Norman*,
  782 F.3d 417 (9th Cir. 2015) .......................................................... 7

*Bautista v. Star Cruises*,
  396 F.3d 1289 (11th Cir. 2005) .................................................... 18

*Comer v. Micor, Inc.*,
  436 F.3d 1098 (9th Cir. 2006) ........................................ 22, 25, 30, 43

*E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*,
  269 F.3d 187 (3d Cir. 2001) .......................................................... 31

*Ege v. Express Messenger Systems, Inc.*,
  2017 WL 87841 (W.D. Wash. Jan. 10, 2017), *aff'd*, 745 F. App'x 19 (9th Cir. 2018) ............................................................................................ 43

*Franklin v. Community Regional Medical Center*,
  998 F.3d 867 (9th Cir. 2021) .................................................... 6, 42

*GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*,
  ___ U.S. ___, 140 S. Ct. 1637 (2020) ........................................ Passim

*Hakopian v. Mukasey*,
  551 F.3d 843 (9th Cir. 2008) ................................................ 27, 49

*Hughes Masonry Co. v. Greater Clark County School Building Corp.*,
  659 F.2d 836 (7th Cir. 1981) ........................................ 25, 40, 41, 42

*In re Pacific Fertility Center Litigation*,
  814 F. App'x 206 (9th Cir. 2020) .............................................. 6, 42

*International Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*,
  206 F.3d 411 (4th Cir. 2000) ........................................ 23, 25, 30, 31

Page(s)

*Kode v. Carlson*,
   596 F.3d 608 (9th Cir. 2010)...................................................................... 7
*Lechner v. Halling*,
   216 P.2d 179 (Wash. 1950)...................................................................... 38
*Letizia v. Prudential Bache Securities, Inc.*,
   802 F.2d 1185 (9th Cir. 1986)...................................................... 5, 26, 44
*Mediterranean Enterprises, Inc. v. Ssangyong Corp.*,
   708 F.2d 1458 (9th Cir. 1983)............................................................ 43, 47
*Mundi v. Union Security Life Insurance Co.*,
   555 F.3d 1042 (9th Cir. 2009)..................................................... 7, 31, 47
*Namisnak v. Uber Technologies, Inc.*,
   971 F.3d 1088 (9th Cir. 2020)...................................................................... 6
*Radach v. Prior*,
   297 P.2d 605 (Wash. 1956)........................................................ 26, 38, 43
*Rajagopalan v. NoteWorld, LLC*,
   718 F.3d 844 (9th Cir. 2013).................................................................... 31
*Setty v. Shrinivas Sugandhalaya LLP*,
   3 F.4th 1166 (9th Cir. 2021) ............................................................Passim
*Shivkov v. Artex Risk Solutions, Inc.*,
   974 F.3d 1051 (9th Cir. 2020)...................................................................... 7
*Tepper Realty Co. v. Mosaic Tile Co.*,
   259 F. Supp. 688 (S.D.N.Y. 1966)........................................................ 41
*Thomson-CSF, S.A. v. American Arbitration Ass'n*,
   64 F.3d 773 (2d Cir. 1995)...................................................... 23, 25, 30
*United States v. Hinkson*,
   585 F.3d 1247 (9th Cir. 2009)...................................................................... 7
*Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Jr. University*,
   489 U.S. 468 (1989)................................................................................ 47

**STATUTES & RULES**

9 U.S.C. § 16.................................................................................................. 1
9 U.S.C. § 201, *et. seq.*........................................................................ 1, 18, 28
11 U.S.C. § 105............................................................................................ 22
28 U.S.C. § 158.............................................................................................. 1
Fed. R. Bankr. P. 8003 ................................................................................ 1

v

## I.    STATEMENT OF JURISDICTION

This appeal arises from an adversary proceeding in the Bankruptcy Court for the Eastern District of Washington.   In that proceeding, Defendants/Appellants Perkins Coie LLP and Lowell Ness (collectively, "Perkins") moved to compel arbitration, and for a stay pending arbitration, under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, T.I.A.S. No. 6997 (the "New York Convention"), as implemented in Chapter 2 of the Federal Arbitration Act (FAA), 9 U.S.C. § 201, *et seq.  See* 3-ER-336-54. The Bankruptcy Court denied the motion.  1-ER-24-32.

Perkins appealed the Bankruptcy Court's Order Denying Motion to Compel Arbitration and Stay and elected to have the District Court hear the appeal.  2-ER-162-90.   The District Court exercised appellate jurisdiction pursuant to Fed. R. Bankr. P. 8003, 28 U.S.C. § 158(a)(1), and 9 U.S.C. § 16.  Sitting in an appellate capacity, the District Court affirmed the Bankruptcy Court's Order Denying Motion to Compel Arbitration and Stay.  1-ER-2-23.

Perkins now appeals to this Court.  This Court has appellate jurisdiction pursuant to 9 U.S.C. § 16 (a)(1)(C) and 28 U.S.C. § 158(d).  *See also Setty v. Shrinivas Sugandhalaya LLP,* 3 F.4th 1166, 1167 (9th Cir. 2021) (holding that this Court has appellate jurisdiction over an appeal from an order denying a motion to compel arbitration under the New York Convention as implemented in the FAA).

1

## II.    STATEMENT OF ISSUES AND STANDARD OF REVIEW

### A.    Overview.

The matter involves an alleged breach of contracts for the sale of digital "tokens." The tokens were sold by a Singapore company, Giga Watt Pte. Ltd. ("GW Singapore"). Each sale was documented in a "WTT Token Purchase Agreement" entered into between GW Singapore and the token purchaser. Purchasing a token allowed the owner to host cryptocurrency mining equipment at facilities maintained by a separate company, Giga Watt, Inc. ("GW Wenatchee"), in Eastern Washington, where electrical rates are low due to abundant hydroelectric power. The arrangement whereby GW Singapore sold tokens and GW Wenatchee hosted cryptomining equipment for purchasers allegedly was a partnership between GW Singapore and GW Wenatchee. The token purchasers were hundreds of independent individuals and entities from around the world.

After GW Wenatchee declared bankruptcy in late 2018, a Trustee was appointed under the Bankruptcy Code and commenced this action against Perkins Coie LLP and one of its partners, Lowell Ness, as an adversary proceeding (E.D. Wash. Bankr. Adv. No. 20-80031; docket sheet at 3-ER-514-26).

The claims against Perkins are based entirely on the rights of the debtor's alleged partner, GW Singapore. The Trustee claims that Perkins entered into an escrow agreement with GW Singapore under which Perkins agreed to hold the

proceeds from token sales until the debtor, GW Wenatchee, had constructed the additional facilities needed to host a portion of the tokens sold. This escrow arrangement was allegedly incorporated by reference into the Token Purchase Agreements under which GW Singapore sold tokens.

Although it was not a party, the Trustee claims GW Wenatchee has the right to enforce, and is liable for the breach of, the alleged escrow agreement and the corresponding escrow provision in the Token Purchase Agreements because of GW Wenatchee's partnership with GW Singapore. Perkins allegedly breached the escrow agreement by prematurely disbursing funds to GW Singapore. The result, according to the Trustee, was to immediately put GW Singapore in breach of the escrow provision in the Token Purchase Agreements. The Trustee seeks to recover from Perkins the funds that allegedly were prematurely disbursed on the theory that GW Wenatchee is liable to token purchasers, under partnership law principles, for GW Singapore's breach of the escrow provision in the Token Purchase Agreements.

In short, the Trustee claims that performance of the alleged escrow agreement was a term of the Token Purchase Agreements and that, when Perkins failed to perform its alleged escrow duties, the Token Purchase Agreements were breached, causing damage to the debtor, GW Wenatchee. The Token Purchase Agreements require that disputes "arising from or related to" the Agreements be arbitrated in Singapore by the Singapore International Arbitration Centre. 3-ER-292-93 ¶¶15(a)

3

and (d). Given that the Trustee's claims depend on a breach of the Token Purchase Agreements and that the Trustee seeks damages allegedly caused by such breach, Perkins moved to compel arbitration and to stay proceedings in the Bankruptcy Court under principles of equitable estoppel and agency. Equitable estoppel provides that if a non-party to a contract is sued for breach of the contract, or on a claim intertwined with the contract, the non-party may avail itself of any term of or defense to the contract.

Perkins' request for arbitration was denied by both the Bankruptcy Court and, on appeal, the District Court, on the theory that: the alleged escrow agreement between Perkins and GW Singapore is separate from the Token Purchase Agreements between GW Singapore and the token purchasers; there is no evidence of an arbitration provision specifically in the escrow arrangement; and there is no evidence that the parties to the Token Purchase Agreements meant for its provisions to apply to the escrow agreement.

**B.    Issues Presented.**

Issue 1: Whether, applying ordinary principles of equitable estoppel, Perkins, as a non-signatory to the Token Purchase Agreements, is entitled to compel arbitration of the Trustee's claims because (a) the Trustee's claims are those of a signatory (GW Singapore) to the Token Purchase Agreements, (b) the Trustee seeks to recover from Perkins damages which allegedly flow from a breach of the Token

4

Purchase Agreements, and (c) the Trustee's claims are inextricably intertwined with the terms, performance, and breach of the Token Purchase Agreements, and the Bankruptcy and District Courts erred in concluding otherwise. *See, e.g., GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, ___ U.S. ___, 140 S. Ct. 1637, 1644 (2020) (holding that background principles of domestic law, such as estoppel and agency, may apply to determine arbitrability under New York Convention); *Setty v. Shrinivas Sugandhalaya LLP*, 3 F.4th 1166, 1168-69 (9th Cir. 2021) (after the Supreme Court's decision in *GE Energy*, recognizing "that a non-signatory could compel arbitration in a New York Convention case" where "the subject matter of the dispute [is] intertwined with the contract providing for arbitration").

Issue 2: Whether arbitration of the Trustee's claims was likewise required because the escrow claims are predicated on an agency relationship between GW Singapore and Perkins with respect to performance under the Token Purchase Agreements such that, under ordinary principles of agency, arbitration should be compelled, and the Bankruptcy and District Courts erred in concluding otherwise. *See, e.g., GE Energy,* 140 S. Ct. at 1644; *Letizia v. Prudential Bache Secs., Inc.*, 802 F.2d 1185, 1188 (9th Cir. 1986) (holding that non-signatory agents of securities broker were entitled to enforce arbitration agreement arising from their alleged wrongdoing in performing under brokerage account contract); *Amisil Holdings, Ltd.*

*v. Clarion Cap. Mgmt.,* 622 F. Supp. 2d 825, 840-41 (N.D. Cal. 2007) (holding that non-signatories, as agents of signatory, may enforce agreement to arbitrate where alleged wrongful conduct of non-signatories relates to performance of agreement and claims are "intertwined" with agreement).

## C.     Standard of Review.

This Court "usually" reviews the denial of a motion to compel arbitration de novo. *Franklin v. Cmty. Reg'l Med. Ctr.*, 998 F.3d 867, 870 (9th Cir. 2021). But this Court has not been entirely consistent on the standard of review when the arbitrability decision concerns equitable estoppel. *Id*. (comparing cases). For example, in *Setty*, this Court stated that an arbitrability decision based on equitable estoppel is reviewed for abuse of discretion. *See* 3 F.4th at 1167-68. But in an earlier case, this Court reviewed arbitrability under equitable estoppel de novo. *See Namisnak v. Uber Techs., Inc.*, 971 F.3d 1088, 1094 (9th Cir. 2020) (reviewing de novo application of principles of estoppel under California law). S*ee also In re Pac. Fertility Ctr. Litig.*, 814 F. App'x 206, 208 (9th Cir. 2020) (unpublished) (same). In *Franklin*, this Court concluded that because "we reach the same result here under both de novo and abuse of discretion review, we need not resolve that inconsistency today and analyze this issue de novo." 998 F.3d at 870. Here, too, regardless of whether a de novo or abuse of discretion standard is applied, the Bankruptcy Court

erred in denying Perkins' Motion to Compel Arbitration under equitable estoppel and agency principles, and the District Court erred in affirming that decision.

A trial court abuses its discretion when it does not apply the correct law, or erroneously interprets the law. *See, e.g., Barnett v. Norman*, 782 F.3d 417, 421-22 (9th Cir. 2015). Likewise, it is an abuse of discretion to erroneously apply the law. *See, e.g., Kode v. Carlson*, 596 F.3d 608, 612 (9th Cir. 2010). An abuse of discretion also occurs where the court "reaches a result that is illogical, implausible, or without support in the inferences that may be drawn from the record." *Id*. (citing *United States v. Hinkson,* 585 F.3d 1247, 1262 (9th Cir. 2009)). Factual findings are reviewed for clear error, and the interpretation and meaning of contract provisions de novo. *Shivkov v. Artex Risk Sols., Inc.,* 974 F.3d 1051, 1058 (9th Cir. 2020), c*ert. denied,* __U.S.__, 141 S. Ct. 2856 (2021). In interpreting the scope of agreements to arbitrate, "due regard" must be given to "the federal policy in favor of arbitration by resolving ambiguities as to the scope of arbitration in favor of arbitration." *Mundi v. Union Sec. Life Ins. Co.*, 555 F.3d 1042, 1044 (9th Cir. 2009).

## III.   STATEMENT OF THE CASE

### A.   The Giga Watt Project.

This matter involves the "tokenization" of cryptomining facilities through the sale of digital WTT Tokens ("tokens") that provided access to the facilities. The tokens were sold by a Singapore company, GW Singapore. *See* 3-ER-387-92 ¶¶ 6-

11, 17.  Another Singapore company, Cryptonomos Pte. Ltd., provided the digital marketing "platform," structureD and conducted the token sale, and drafted the "Giga Watt WTT Token Launch White Paper" ("White Paper") that was used to market the tokens.  3-ER-391 ¶ 15; 3-ER-419-47.  Cryptonomos ███████████ ████████████████████████████████████████████████████████████ 3-ER-391:11;  3-ER-391:16-17;  4-ER-538:16-17;  3-ER-398:4-7;  4-ER-545:4-7.  During the course of this work, ██████████████████████████████████ ████████████████████████████████ 3-ER-398:9-11; 4-ER-545:9-11; 3-ER-396:12-14; 4-ER-543:12-14.  To buy tokens, purchasers went onto the internet and agreed to a "WTT Token Purchase Agreement" with GW Singapore.  3-ER-404 ¶ 48.

A token entitled the holder to place one watt of cryptocurrency mining equipment in GW Wenatchee's facilities in Eastern Washington for up to 50 years.  3-ER-391 ¶ 15; 3-ER-430.  GW Singapore also sold, in separate transactions, specialized computers used in cryptomining.  3-ER-423.  Purchasers were required to buy sufficient tokens to match the power usage (in watts) of the cryptomining computers they wished to host in GW Wenatchee's facilities.  3-ER-430.  For example, one who purchased a cryptomining computer that used 1,000 watts to operate needed to buy 1,000 tokens to host the computer at GW Wenatchee's facility.  The price of a token varied from $1.00 to $1.20, depending upon when, during the

sale period, tokens were purchased. 3-ER-400 ¶ 41; 3-ER-437. The arrangement whereby GW Singapore sold tokens and computers, and GW Wenatchee hosted the cryptomining activities of purchasers, allegedly was a general partnership. 3-ER-389-392 ¶¶ 10, 19.

**B.    The "White Paper" and the WTT Token Purchase Agreements.**

The White Paper, used to market the tokens, was accessed online at the Token Launch Site maintained by Cryptonomos. It described cryptocurrency mining generally, the Giga Watt project, token launch details, a projected timeline, the "team" involved, a number of "Risk Factors," and other relevant information. 3-ER-419-47. There were, apparently, multiple versions of the White Paper—it was published in English and translated into numerous foreign languages. 3-ER-421.

The English version (attached as Exhibit A to the Trustee's Complaint and Amended Complaint) explained that GW Wenatchee had some pre-existing facilities that would be available to host token purchasers, 3-ER-400:6-7, but that additional facilities would be constructed to accommodate token purchasers who bought after the existing capacity was committed.. *Id.;* 3-ER-392 ¶ 18. In this regard, 5.4 million tokens would be issued immediately upon the conclusion of the token sale. 3-ER-433. For any additional tokens sold, the White Paper explained: "New batches of tokens will be issued in step with the construction of new units," and "Cryptonomos

9

will issue and distribute its initial batch of WTT tokens, with subsequent batch issues to follow upon the completion of new capacity construction." 3-ER-433-34.

For those tokens that could not be accommodated with the corresponding capacity of pre-existing facilities, the White Paper stated that sales proceeds would be held "in escrow" until GW Singapore issued the tokens in step with the construction of additional facilities: "All funds collected through the pre-sale and Token Launch will be deposited in escrow" (3-ER-436); "The funds will be released from escrow in step with the completion of facilities" (*id*.); and, if the token sale is over-subscribed, the "over-subscribed proceeds will be placed into escrow until the requisite processing center capacity has been built out." 3-ER-437.

If additional facilities could not be constructed within a reasonable time, such that additional tokens were not issued, the White Paper stated that token purchasers could request a refund:

> If the completion of the capacities is delayed by more than 3 months from the projected date, and, consequently, the relevant WTT tokens are not issued, the escrow agent may issue a refund at the request of the WTT token purchasers.

3-ER-445 ¶ H.

The first page of the White Paper contained a "Legal Disclaimer," which stated that the White Paper "does not imply any elements of a contractual relationship" and its "sole purpose" is to provide "reasonable information" to allow interested purchasers "to undertake a thorough analysis of the company." 3-ER-421.

It is undisputed that no party entered into the White Paper as a distinct agreement. 1-ER-29 ¶ 9; 1-ER-3:23-24. Instead, as noted above, tokens were purchased under the Token Purchase Agreements between "GW Singapore and the token holders." *See* 3-ER-404 ¶ 48; 1-ER-3:24-26.

## C. The Trustee Seeks to Enforce the Token Purchase Agreements Against Perkins.

████████████████████████████████████████

████████████████████████████████████████

████████████████████████ 1-ER-29 ¶ 10; 3-ER-401-02 ¶ 44; 4-ER-548-49 ¶ 44. To facilitate this, ████████████████

████████████████████████████████████████

████████ 2-ER-218:3-5; 2-ER-218:24-28; 3-ER-401-02 ¶ 44; 4-ER-548-49 ¶ 44. The White Paper does not mention Perkins Coie. *See* 3-ER-419-47. However, Cryptonomos allegedly had a website that mentioned Perkins under the heading "Legal Consulting and Escrow." 3-ER-404:6-8.

The token sale occurred between May 19, 2017, and July 31, 2017, and raised approximately $22.4 million. *See* 3-ER-393-94 ¶¶ 22, 24; 4-ER-540-41 ¶¶ 22, 24. After accounting for certain refunds, the total sale proceeds Perkins received were approximately $21.6 million. 3-ER-394:10-21; 4-ER-541:10-21. During the next six months, Perkins disbursed these funds in eight increments. 3-ER-393 ¶ 22; 4-ER-540 ¶ 22. The first four disbursements, totaling $10.8 million, were sent to GW

11

Singapore.  3-ER-393:12;  3-ER-394:11-16;  4-ER-541:11-16.  The last four

disbursements, totaling $10.865 million, went to GW Wenatchee ████████

████████.  3-ER-393:12-394:21;  4-ER-540:12-541:21.  Before each

disbursement, ██████████████████████████████████████████

██████████████████████.  3-ER-393:19-21; 4-ER-540:19-21; 3-ER-393-94

¶¶ 21, 24; 4-ER-540-41 ¶¶ 21, 24; 3-ER-413-14 ¶¶ 79, 81; 4-ER-560-61 ¶¶ 79, 81.

███████████████████████████████████████████████████████

████ the Trustee claims that the four disbursements totaling $10.8 million to GW

Singapore were premature because construction of additional hosting capacity had

not yet been completed.  3-ER-393-94 ¶¶ 22, 23; 4-ER-540-41 ¶¶ 22, 23; 3-ER-412

¶ 71; 4-ER-559 ¶ 71.  The Trustee characterizes GW Singapore's receipt of these

distributions as a "misappropriation" of the allegedly escrowed funds and claims that

the release of those funds constituted a breach of the terms of escrow in the Token

Purchase Agreements.  3-ER-395 ¶ 26.

　　　To claim breach of the Token Purchase Agreements, the Trustee relies upon

a version of the document filed in the underlying Bankruptcy by token purchaser

Scott Glasscock as ECF 548 in the main Bankruptcy proceeding (E.D. Wash. Bankr.

Ct. No. 18-03197-FPC11).  *See* 3-ER-287-94.  That version of the Token Purchase

Agreement mentions neither an escrow nor Perkins, does not specify the conditions

under which the transaction was to close, nor does it explain when sale proceeds

would be released to the seller.  *Id.*  But paragraph 6 says that "[t]he WTT Tokens terms and conditions are as set forth in the White Paper."  3-ER-289 ¶ 6.  The Trustee interprets this language to incorporate the references to an escrow in the White Paper into the Token Purchase Agreements as contractual terms of sale.  *See* 3-ER-389-404 ¶¶ 10, 18, 26, 28, 42, 48.

The Trustee likewise seeks to create and define Perkins' duties as an escrow agent as resulting from the incorporation of the White Paper into the Token Purchase Agreements.  Specifically, there is no written escrow agreement between Perkins and any party, and no such agreement has been alleged.  *See* 3-ER-402; 4-ER-549; 3-ER-282 ¶ 2; 1-ER-27 ¶ 6.  Thus, to create the substance of Perkins' "escrow" duties, the Trustee alleges that, because Perkins knew of the description of escrow in the White Paper, and of the White Paper's incorporation into the Token Purchase Agreements, Perkins agreed to perform the escrow arrangement incorporated into the Token Purchase Agreements when Perkins agreed to act as an escrow and accept payments from the various token purchasers:

3-ER-413:18-22; 4-ER-560:18-22.  *See also* 3-ER-396:13-19; 4-ER-543:13-19.

In turn, according to the Trustee's theory, the resulting escrow duties did not allow Perkins to rely on the issuance of tokens by GW Singapore as a trigger for the

release of funds from its IOLTA account. 3-ER-392-93 ¶¶ 18, 21; 4-ER-540 ¶ 21. Rather, Perkins purportedly was required to ascertain whether construction of additional hosting capacity was complete—i.e., verify completion of the material terms of performance under the Token Purchase Agreements—before releasing token purchase proceeds. *Id.; see also* 3-ER-412-13 ¶¶ 71, 79; 4-ER-559-60 ¶¶ 71, 79.

Thus, under the Trustee's theory, Perkins' duties as an escrow agent are identical to the escrow provision incorporated into the Token Purchase Agreements because both are derived from the same source—the description of an "escrow" in the White Paper, which allegedly was incorporated into the Token Purchase Agreements. Of necessity, then, when Perkins allegedly breached its escrow duties under the escrow agreement, the result was a simultaneous breach of identical provisions in the Token Purchase Agreements, allegedly thereby damaging the debtor, GW Wenatchee. 3-ER-395-96 ¶¶ 26, 28.

Critically, on the issue of standing, GW Wenatchee was not a party to either an escrow agreement or to the Token Purchase Agreements, and thus cannot directly enforce either. To address this, the Trustee alleges that GW Wenatchee was in a partnership with GW Singapore based upon language in the White Paper that describes the "Giga Watt Project" as a "partnership" or which describes GW Wenatchee and GW Singapore as "partners." *See* 3-ER-392-93 ¶¶ 19, 20. Based

14

upon this partnership characterization, the Trustee then alleges that the rights and liabilities of GW Singapore and GW Wenatchee were one and the same, and that GW Wenatchee may enforce, and is liable under, any agreement that GW Singapore entered into as a partner of the "Giga Watt Project." *E.g.*, 3-ER-392:17-19. ("As partners, Giga Watt and GW Singapore were agents of each. They could enforce agreements entered into by the other in the course of the partnership . . . ."). Using the same reasoning, the Trustee alleges GW Wenatchee was in "privity" with Perkins "with respect to the Escrow agreement" because GW Wenatchee was the partner of GW Singapore. 3-ER-411:5.

To summarize, the Trustee's theory is that the Token Purchase Agreements incorporated an "escrow" provision from the White Paper, which GW Wenatchee has standing to enforce as the partner of GW Singapore, who was a party to, and signatory of, the Agreements. Likewise, Perkins is alleged to have known of, and agreed to perform, the escrow provisions incorporated into the Token Purchase Agreements which, again, GW Wenatchee allegedly can enforce, and is liable for the breach of, as the partner of GW Singapore. Effectively, therefore, the Trustee alleges that both GW Wenatchee and Perkins were, by their respective agency relationships and conduct, bound to perform the escrow provision in the Token Purchase Agreements. Based upon the alleged premature distribution of funds, the Trustee seeks to hold Perkins liable for a breach of the escrow provision incorporated

into the Token Purchase Agreements and to recover from Perkins, as damages, the prematurely released token sale proceeds. *E.g.,* 3-ER-393-97 ¶¶ 20, 26, 28, 32.

## D.    The Token Purchase Agreements Require Arbitration of Disputes.

A version of the Token Purchase Agreement that Cryptonomos emailed to Perkins for review and comment prior to its use in the token sale contained a paragraph 8(a) providing that the parties "submit and consent to the exclusive jurisdiction of the [sic] Singapore" with regard to any litigation "that may arise directly or indirectly from [the Token Purchase] Agreement." *See* 3-ER-301 ¶ 8(a). The paragraph also contained a straightforward arbitration clause providing that "[a]ny dispute arising out of or in connection with this contract" shall be arbitrated in Singapore by the Singapore International Arbitration Centre, before a panel of three arbitrators, in English. *Id.*

The arbitration provision in the Token Purchase Agreement filed as Bankruptcy ECF No. 548, and on which the Trustee relies, has an even more prominent and detailed arbitration provision. At the top of the first page, there is a disclosure, in all-capital letters, that the agreement contains a binding arbitration clause and a waiver of the right to bring representative or class actions. *See* 3-ER-288. The referenced arbitration clause is in paragraph 15(a):

**Binding Arbitration…**

Purchaser and the Company will arbitrate Disputes through binding arbitration (which is the referral of a Dispute to one or more persons

charged with reviewing the Dispute and making a final and binding determination to resolve it instead of having the Dispute decided by a judge or a jury in court).

3-ER-292 ¶ 15(a).  "Disputes," which define the scope of what is to be arbitrated, is defined earlier in the paragraph as:

> Except for any disputes, claims, suits, actions, causes of action, demands or proceedings (collectively, "*Disputes*") in which either Party seeks to bring an individual action in small claims tribunals or seeks injunctive or other equitable relief for the alleged unlawful use of intellectual property, including, and without limitation, copyrights, trademarks, trade names, logos, trade secrets or patents….

*Id.*  Thus, the arbitration clause is applicable to all types of "disputes, claims, suits, actions, causes of action, demands or proceedings" arising from or related to the Agreement, excepting only certain small claims and intellectual property proceedings.  "Company" is defined in the preamble to be "Giga Watt Pte. Ltd." i.e., GW Singapore.  3-ER-288.  Because the Trustee claims to stand in the shoes of GW Singapore, and to be asserting the rights of GW Singapore, the arbitration clause applies to the Trustee.  Paragraphs 15(a) and (d) then provide for arbitration in Singapore before the Singapore International Arbitration Centre of all disputes "arising from or related to" the Token Purchase Agreement.  3-ER-292-93 ¶¶ 15(a), (d).

## E.    Proceedings Below.

Based on the arbitration provisions, Perkins moved the Bankruptcy Court to compel arbitration and for a stay pending arbitration.  3-ER-336-53.  Because the

17

Token Purchase Agreements involve both foreign and U.S. parties, and call for arbitration in Singapore, they are international arbitration agreements. International arbitration agreements involving parties in the United States are governed by Chapter 2 of the FAA, which codifies the New York Convention. *See* 9 U.S.C. §§ 201-208.

In determining whether arbitration must be compelled under the Convention, the court reviews only the following four elements:

> (1) there is an agreement in writing within the meaning of the Convention; (2) the agreement provides for arbitration in the territory of a signatory of the Convention; (3) the agreement arises out of a legal relationship, whether contractual or not, which is considered commercial; and (4) a party to the agreement is not an American citizen, or that the commercial relationship has some reasonable relation with one or more foreign states.

*Balen v. Holland Am. Line Inc.*, 583 F.3d 647, 654-55 (9th Cir. 2009) (quoting *Bautista v. Star Cruises,* 396 F.3d 1289, 1294 n.7 (11th Cir. 2005)); *see also* 9 U.S.C. § 202. If these elements are established, the "Convention requires that courts must enforce an agreement to arbitrate unless the agreement is 'null and void, inoperative or incapable of being performed.'" 583 F.3d at 654-55.

In the proceedings before the Bankruptcy Court, and later on appeal to the District Court, elements (2), (3), and (4) of the analysis were not seriously disputed because the Token Purchase Agreement provided for arbitration outside of the United States, arose out of a commercial relationship, involved parties that were not

18

U.S. citizens, and had some reasonable relation to another state, Singapore, which is a signatory state to the New York Convention. *See* 3-ER-351. With regard to the requirement for a written arbitration agreement, which was contested, Perkins relied on the Supreme Court's recent decision in *GE Energy,* __U.S.__, 140 S. Ct. 1637, holding that equitable estoppel may be used to satisfy the written agreement element under the New York Convention.

In this regard, Perkins argued that equitable estoppel entitled it to demand arbitration under the arbitration clause in the Token Purchase Agreements given that the Trustee: asserts the rights of a signatory to the Token Purchase Agreements; and claims that Perkins assumed escrow duties which were incorporated into the Token Purchase Agreements, caused a breach of those Agreements when it failed to perform those duties, and is responsible to the Trustee for the damage (liability to token purchasers for prematurely released proceeds) allegedly resulting from breach of the Token Purchase Agreements.

The Bankruptcy Court denied Perkins' motion without addressing equitable estoppel, holding that Perkins could not enforce the arbitration clause in the Token Purchase Agreements because it was not a party, and that there was no evidence of an arbitration clause specific to the supposedly separate escrow agreement between Perkins and GW Singapore:

> The evidence presented for the purposes of this Motion does not definitively establish the terms of the escrow agreement between Perkins and Giga Watt Singapore. If Perkins could produce a written escrow agreement with Giga Watt Singapore that contained an arbitration clause, the Court's conclusion might change. But as it stands, the evidence relied upon by Perkins consists of agreements that it was not a party to; instead, the agreements Perkins relies upon are between Giga Watt Singapore and WTT Token purchasers.

1-ER-29-30 ¶ 13.

On appeal, the District Court affirmed on similar grounds and on one additional ground. The additional ground was that the District Court construed the arbitration agreement to be limited to disputes between the parties to the Token Purchase Agreements and thus viewed application of equitable estoppel as stretching the arbitration provision "beyond its intended meaning." 1-ER-18:24-26. Like the Bankruptcy Court, the District Court held that the escrow agreement and Token Purchase Agreement are separate, and unrelated Agreements, and that there is no evidence of an arbitration provision in the escrow agreement. 1-ER-18:23-19:11.

> Giga Watt Singapore's escrow agreement with Perkins Coie pertains to an entirely different transaction (the escrow arrangement) and involves a different set of parties (Giga Watt Singapore and Perkins Coie). Moreover, just because the escrow arrangement was the facilitating mechanism for the purchase of the tokens does not mean that the purchase contract for the tokens was meant to cover the escrow arrangement—in fact, none of the terms in the Glasscock TPA would even be relevant to the terms of the escrow agreement.

1-ER-19:1-8.

20

**F.     Related Proceedings.**

The Court should be aware of the following related proceedings.  First, there is a putative class action against Perkins on behalf of token purchasers that is based on the same facts as those at issue in this case, asserts similar claims, and seeks the same damages (prematurely released token purchase proceeds) as the Trustee does here.  The putative class action is pending in the Eastern District of Washington, and is captioned: *Dam v. Perkins Coie, LLP, et al.*, E.D. Wash. No. 2:20-CV-000464-SAB.

In that action, Perkins also moved to compel arbitration.  However, before that motion could be decided, the Trustee moved in the main bankruptcy proceeding, E.D. Wash. Bankr. Ct. No. 18-03197-FPC11, for an order that the claims asserted by the putative class of token purchasers were not owned by the token purchasers, but rather by the bankruptcy estate of GW Wenatchee.  In turn, the Trustee requested that the Bankruptcy Court enjoin the Class Action as a violation of the automatic stay provision of the Bankruptcy Code.  In other words, the Trustee claimed not only standing to enforce the Token Purchase Agreements, but exclusive standing.

Thereafter, the Bankruptcy Court ruled that three of the five claims asserted by the Class—breach of fiduciary duty, breach of agreement between Perkins and the token holders, and breach of agreement between Perkins and Cryptonomos/GW Wenatchee/GW Singapore—belong to the Trustee, not to token purchasers.  E.D.

Wash. Bankr. Ct. No. 18-03197-FPC7, ECF No. 921 at 27. As for the two statutory claims, the Bankruptcy Court ruled that they belonged to the token holders. *Id.* However, the Trustee then commenced an adversary proceeding against the would-be class representative, Jun Dam, seeking to enjoin prosecution of the remaining statutory claims until the Trustee obtains a decision on the claims asserted against Perkins in this matter. That adversary proceeding is captioned *Waldron v. Dam*, E.D. Wash. Bankr. Adv. No. 21-80053. The Bankruptcy Court granted the Trustee's request for injunctive relief under 11 U.S.C. § 105. E.D. Wash. Bankr. Adv. No. 21-80053, ECF No. 38.

Mr. Dam has appealed both of the Bankruptcy Court's rulings to the District Court. S*ee* E.D. Wash. No. 22-cv-00040-SAB. Either way the issues are decided, it is very possible that those rulings will ultimately be appealed to this Court.

## IV.   SUMMARY OF ARGUMENT

Under the New York Convention, a non-signatory to a contract containing an arbitration clause is entitled to compel arbitration under ordinary principles of estoppel and agency. *See, e.g., GE Energy*, 140 S. Ct. at 1644; *Setty*, 3 F.4th at 1168-69. Under estoppel principles, a non-signatory may enforce the arbitration requirement where the claims of the signatory against the non-signatory are "intertwined" with the contract that contains the arbitration provisions. *See, e.g., Setty,* 3 F.4th at 1168-69; *Comer v. Micor, Inc.*, 436 F.3d 1098, 1101 (9th Cir. 2006);

*Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH,* 206 F.3d 411, 416–17 (4th Cir. 2000); *Thomson-CSF, S.A. v. Am. Arbitration Ass'n,* 64 F.3d 773, 776 (2d Cir. 1995).

Here, the Trustee asserts the rights and liabilities of a signatory to the Token Purchase Agreements (GW Singapore) against a non-signatory (Perkins). In addition, the Trustee's claims are dependent upon and intertwined with the terms, performance, and breach of the Token Purchase Agreements, which contain the arbitration requirement. Applying estoppel principles to the allegations of the Trustee's Complaint, arbitration of the Trustee's claims against Perkins should have been compelled, for three reasons.

First, a predicate of the Trustee's claims is that the alleged terms of escrow described in the "White Paper" became contractually binding. Because the White Paper is not itself a binding contract, the Trustee repeatedly alleges that the description of the escrow in the White Paper was incorporated by reference into, and became a term of, the Token Purchase Agreements. 3-ER-389-404 ¶¶ 10, 18, 26, 28, 48; *see also* 3-ER-289 ¶¶ 6, 7. Thus, the escrow duties which Perkins allegedly breached were incorporated into, and became a term of, the Token Purchase Agreements—the contract containing the arbitration clause.

Second, and critical to the Trustee's theory of liability and damages, the Trustee claims that Perkins' failure to carry out its escrow duties caused a breach of

the Token Purchase Agreements. 3-ER-395-96 ¶¶ 26, 28. By breaching its escrow duties and thereby causing a breach of the identical escrow provisions in the Token Purchase Agreements, Perkins' performance of the terms of escrow allegedly created liability on the part of GW Wenatchee (as alter ego of GW Singapore) under the Token Purchase Agreements in the amount of the purchase proceeds paid under the Agreements. 3-ER-395-97 ¶¶ 27, 28, 32. In other words, the Trustee seeks to hold Perkins liable for a breach of the Token Purchase Agreement on the theory that Perkins breached duties that it knew had been incorporated into those Agreements as material, contractual terms.

Third, the Trustee's theory is that Perkins' escrow duties were an integral part of performance of the Token Purchase Agreements. In essence, the Trustee alleges that Perkins was required to verify the completion of performance under the Token Purchase Agreements before releasing token purchase proceeds. Under the Trustee's allegations, Perkins could not simply release funds when tokens were issued. Rather, Perkins had to ascertain whether GW Singapore was entitled to close the sale transactions and receive the purchase price by virtue of having constructed sufficient hosting capacity. Indeed, because Perkins had control over the sale proceeds, the parties to the Token Purchase Agreements could not close until Perkins determined, under the terms of escrow, whether GW Singapore had tendered full performance. The Trustee's assertion that Perkins breached the terms of escrow thus

24

*depends on* whether the required terms of the Token Purchase Agreements (facility construction) had been performed.

This is true whether the Perkins' escrow duties were incorporated into the Token Purchase Agreements or were in a separate agreement as the Courts below held. Either way, Perkins' performance of the terms of the escrow agreement was inextricably intertwined with performance of the Token Purchase Agreements. Release of token purchase proceeds can only be "premature" under the terms of escrow if performance under the Token Purchase Agreements has not been completed. It is not possible for a breach of the escrow agreement to cause a breach of the Token Purchase Agreements unless performance of the escrow agreement is closely intertwined with performance of the Token Purchase Agreements.

Thus, in multiple ways, the Trustee's claims against Perkins are inextricably intertwined with, and dependent upon, the terms, performance, and breach of the Token Purchase Agreements, which contain the arbitration clause. Applying ordinary principles of estoppel, arbitration should have been compelled. *See, e.g., Setty,* 3 F.4th at 1168-69; *Comer*, 436 F.3d at 1101; *Int'l Paper*, 206 F.3d at 416–17; *Thomson-CSF,* 64 F.3d at 776; *Hughes Masonry Co. v. Greater Clark Cnty. Sch. Bldg. Corp.,* 659 F.2d 836, 838-41 (7th Cir. 1981).

In addition, ordinary agency principles require arbitration of the Trustee's claims. An escrow agreement is a tripartite agreement where the escrow agent acts

25

as the agent of the parties to the primary transaction to facilitate performance and closing. *See Radach v. Prior*, 297 P.2d 605 (Wash. 1956) (holding that an escrow is agent of both parties to the transaction and, upon performance of conditions, agent of one or the other). Under agency principles, where the claim is against a non-signatory agent of the principals to an agreement, and the claims arise out of the performance and alleged breach of that agreement, the non-signatory agent may enforce the agreement. *See, e.g., Letizia*, 802 F.2d at 1188 (holding that non-signatory agents of securities broker were entitled to enforce arbitration agreement arising from their alleged wrongdoing in performing under brokerage account contract); *Amisil Holdings,* 622 F. Supp. 2d at 840-41 (holding that non-signatories, as agents of signatory, may enforce agreement to arbitrate, where alleged wrongful conduct of non-signatories relates to performance of agreement and claims are "intertwined" with agreement). Accordingly, Perkins is entitled to arbitrate the Trustee's claims under agency principles since its conduct as an escrow agent of the principals to the Token Purchase Agreements allegedly caused a breach of those Agreements and resulted in liability under those Agreements.

To the extent that the District Court held that the arbitration agreement was not "meant" to cover disputes with non-signatories to the Token Purchase Agreement, the Court misconstrued the doctrine of equitable estoppel. Estoppel does not function based on the parties' intent; it works to prevent injustice by

precluding a party from obtaining a benefit from taking inconsistent positions. It is inequitable to allow the Trustee to sue Perkins for a breach of the Token Purchase Agreements while simultaneously contending the terms of those Agreements were not intended to apply to Perkins.

Finally, to the extent they concluded that the escrow agreement was separate, distinct, and unrelated to the Token Purchase Agreements, both the Bankruptcy and District Courts disregarded the repeated, express allegations of the Trustee's Complaint. 3-ER-389-404 ¶¶ 10, 18, 26, 28, 48. For example, the District Court's conclusion that "none of the terms in the Glascock TPA would even be relevant to the terms of the escrow agreement" ignores the Trustee's allegations that Perkins' escrow duties are actually incorporated into the Token Purchase Agreements such that Perkins' alleged breach of its duties caused the simultaneous breach of the Token Purchase Agreement for which the Trustee seeks damages.

The Trustee's allegations are judicial admissions, conclusively binding on the Trustee, and may not be disregarded. *See Hakopian v. Mukasey*, 551 F.3d 843, 846 (9th Cir. 2008) (holding that "[a]llegations in a complaint are considered judicial admissions" and constitute undisputed facts); *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988) (holding that factual assertions in pleadings "are considered judicial admissions conclusively binding on the party who made them" including "before the trial court" and "on appeal"). It was, therefore, error for the

27

Bankruptcy and District Courts to disregard the Trustee's allegations and reach conclusions directly contrary to those allegations.

For all of the above reasons, the orders of the Bankruptcy and District Courts should be reversed, and the matter remanded with instructions to compel arbitration in Singapore, as required by the Token Purchase Agreements.

## V.   ARGUMENT

### A.   Arbitration Is Required Under Ordinary Estoppel and Agency Principles, and the Bankruptcy and District Courts Erred in Concluding Otherwise.

Perkins moved the Bankruptcy Court to compel arbitration under the arbitration provisions of the Token Purchase Agreements that are at the heart of this dispute.  *See* 3-ER-336-53.  The arbitration clause in those Agreements requires that all "Disputes," "arising from or related to" the Agreements, be arbitrated in Singapore before the Singapore International Arbitration Centre.  *See, e.g.,* 3-ER-292-293 ¶¶ 15(a), (d).  Because the claims against Perkins are a "dispute" that arise from or relate to the Agreements under the Trustee's theory that the escrow agreement was incorporated into the Agreements, and because the Agreements contain an international agreement to arbitrate, Perkins moved to compel arbitration and stay the litigation under Chapter 2 of the FAA, which codifies the New York Convention.  *See* 9 U.S.C. §§ 201- 208.  All of the elements necessary to compel arbitration under the Convention exist in that (1) Perkins relies on a written

agreement to arbitrate; (2) the agreement calls for arbitration in Singapore, a signatory to the Convention; (3) the agreement arose from a commercial relationship; and (4) the Trustee is asserting the rights of a party to the agreement that is not a U.S. citizen, and the agreement was with parties from all over the world. *See* 3-ER-347-48; *Balen*, 583 F.3d at 654-55 (discussing elements necessary to compel arbitration under the Convention).

The primary issue presented to this Court is whether arbitration should have been compelled under principles of estoppel and agency, and whether the courts below erred in holding otherwise. Applying ordinary estoppel and agency principles to the Trustee's allegations, arbitration should have been compelled. In holding otherwise, the Bankruptcy and District Courts both erroneously disregarded the allegations of the Trustee's Complaint, and failed to apply, or misapplied, applicable principles of estoppel and agency.

1. <u>Ordinary Estoppel and Agency Principles Apply to Determine Arbitrability Under the New York Convention.</u>

In *GE Energy*, the United States Supreme Court held that underlying principles of domestic law, such as equitable estoppel, do not conflict with the New York Convention's requirement of a "written agreement" and can be used under the Convention to enforce international agreements to arbitrate. 140 S. Ct. at 1644-45. "Far from displacing domestic law, the provisions of Article II contemplate the use of domestic doctrines to fill gaps in the Convention." *Id.* at 1645. Subsequently, in

*Setty*, this Court reasoned that, "following the Supreme Court's decision in *GE Energy*, we accept that a non-signatory could compel arbitration in a New York Convention case." 3 F.4th at 1168-69.

In *Setty,* this Court held that determining the enforceability of an arbitration clause by a non-signatory was a "threshold issue" to which the choice-of-law provisions of the contract itself do not apply. 3 F.4th at 1168. Rather, "in cases involving the New York Convention, in determining the arbitrability of federal claims by or against non-signatories to an arbitration agreement, we apply 'federal substantive law,' for which we look to 'ordinary contract and agency principles.'" *Id*. "Among these principles are '1) incorporation by reference; 2) assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel.'" *Comer*, 436 F.3d at 1101 (quoting *Thomson–CSF,* 64 F.3d at 776).

## 2.     Ordinary Estoppel Principles Require Arbitration of This Dispute.

"Well-established common law principles dictate that in an appropriate case a non-signatory can enforce, or be bound by, an arbitration provision within a contract executed by other parties." *Int'l Paper*, 206 F.3d at 416-17. Equitable estoppel is among the "ordinary principles" under which arbitration may be compelled. *See, e.g., GE Energy*, 140 S. Ct. at 1643-44; *Setty,* 3 F.4th at 1168-69; *Comer*, 436 F.3d at 1101; *cf., e.g., Arthur Andersen LLP v. Carlisle,* 556 U.S. 624,

631 (2009) ("traditional principles" of contract such as estoppel "allow a contract to be enforced by or against nonparties") (applying state law).

"Equitable estoppel precludes a party from claiming the benefits of a contract while simultaneously attempting to avoid the burdens that contract imposes." *Setty*, 3 F.4th at 1169 (quoting *Mundi*, 555 F.3d at 1045).

> In the arbitration context, the doctrine recognizes that a party may be estopped from asserting that the lack of his signature on a written contract precludes enforcement of the contract's arbitration clause when he has consistently maintained that other provisions of the same contract should be enforced to benefit him. "To allow [a plaintiff] to claim the benefit of the contract and simultaneously avoid its burdens would both disregard equity and contravene the purposes underlying enactment of the Arbitration Act.

*Int'l Paper*, 206 F.3d at 418.

Under estoppel principles, non-signatories may enforce arbitration clauses against signatories "because of the close relationship between the entities involved, as well as the relationship of the alleged wrongs to the non-signatory's obligations and duties in the contract and the fact that the claims [are] intertwined with the underlying contractual obligations." *Mundi*, 555 F.3d at 1046 (quoting *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 201 (3d Cir. 2001)). In cases involving "a nonsignatory seeking to compel a signatory to arbitrate its claims against the nonsignatory," for equitable estoppel to apply, "it is 'essential ... that the subject matter of the dispute [is] intertwined with the contract providing for arbitration.'" *Setty,* 3 F.4th at 1169 (quoting *Rajagopalan*

31

*v. NoteWorld, LLC*, 718 F.3d 844, 847 (9th Cir. 2013)).  Here, the prerequisites for compelling arbitration under equitable estoppel are met.

> ### (a)   The Trustee is asserting the contractual rights and liabilities of GW Singapore.

First, equitable estoppel applies to the Trustee's claims because he purports to assert GW Singapore's contractual rights and liabilities as a signatory to the Token Purchase Agreements and escrow agreement.  Central to the Trustee's theory of the case is that GW Wenatchee was a "partner" of GW Singapore in "tokenizing" GW Wenatchee's cryptomining hosting facilities and services.  *See, e.g.,* 3-ER-389-96 ¶¶ 10, 11, 17, 19, 20, 25, 26, 28; 3-ER-411 ¶ 68.  Thus, the Trustee alleges, the contractual rights and liabilities of GW Wenatchee and GW Singapore were coextensive and one and the same:

> As partners, [GW Wenatchee] and GW Singapore were agents of each.  They could enforce agreements entered into by the other in the course of the partnership and they could be liable on contracts entered into by the other.  They could impose liability on the other by their conduct.

3-ER-392 ¶ 19.  This factual and legal predicate—that GW Wenatchee and GW Singapore were partners, and that their rights and liabilities were therefore inseparable, indistinguishable, and one and the same—is *a sine qua non* of the Trustee's case.  Without it, GW Wenatchee can assert no rights in or under the relevant contracts—the Token Purchase Agreements or escrow agreement allegedly incorporated into it—and would have no liabilities by virtue of their breach.

Similarly, based on the predicate that GW Wenatchee is the partner of GW Singapore, with all of the same rights and liabilities, the Trustee asserts that GW Wenatchee "has privity" with Perkins and may assert GW Singapore's contractual rights against Perkins:

> Giga Watt [Wenatchee] has privity with Perkins Coie with respect to the Escrow agreement because its partner, GW Singapore entered into the Escrow agreement pursuant to the Giga Watt Project [i.e., as part of the alleged partnership].

3-ER-411 ¶ 68. This alleged "privity" which exists by and through the rights of GW Singapore, is the basis of the Trustee's claims against Perkins:

> In the First Claim for Relief, the Trustee asserts that, standing in the shoes of Giga Watt, he can enforce the Escrow against Perkins Coie because Giga Watt [Wenatchee] and GW Singapore were partners, as alleged above.

3-ER-393 ¶ 20.

Thus, the Trustee is asserting GW Singapore's contractual rights and liabilities against Perkins. But if the Trustee, on GW Wenatchee's behalf, may assert GW Singapore's rights and liabilities, then it must also accept all of GW Singapore's contractual burdens—including GW Singapore's agreement to arbitrate claims it asserts which arise from or relate to the Token Purchase Agreements. That is the fundamental premise of estoppel. If you assert the benefits of a contract, it is only fair that you be subject to burdens and restrictions imposed by the contract.

33

**(b)** **The Trustee's claims against Perkins are inextricably intertwined with, and dependent upon, the terms, performance, and breach of the Token Purchase Agreements, which contain the arbitration clause.**

Critically, the Trustee's claims against Perkins are inextricably intertwined with the Token Purchase Agreements in at least four ways: (1) the escrow duties that Perkins allegedly agreed to perform and breached were incorporated into the Token Purchase Agreements as a contractual term; (2) the purpose of incorporating the escrow terms was to dictate the structure and legal characterization of the token sale transaction; (3) as escrow agent, Perkins allegedly performed a critical function on behalf of the parties to the Token Purchase Agreements by verifying that performance under the Agreements had been completed before allowing the transactions to close by release of the purchase proceeds; and (4) Perkins' alleged breach of its escrow duties caused a breach of the Token Purchase Agreements, resulting in vicarious liability for the debtor which the Trustee seeks to recover from Perkins. For all these reasons, the Trustee's claims are inextricably intertwined with multiple material aspects of the Token Purchase Agreements.

First, the Trustee repeatedly alleges that Perkins' escrow duties are incorporated by reference into the Token Purchase Agreements as a contractual term:

> GW Singapore opened the Escrow with Perkins Coie. According to the White Paper, which describes the Giga Watt Project in detail, **and whose provisions were incorporated by reference into the token**

> **purchase agreements**, all token sale proceeds would be held in escrow until Giga Watt met certain milestones in constructing the new facilities.

3-ER-392 ¶ 18 (emphasis added); *see also, e.g.,* 3-ER-389-90 ¶ 10.

Similarly, the liability which the Trustee has allegedly incurred under the Token Purchase Agreements arises from Perkins' alleged failure to perform the incorporated duties:

> Perkins Coie's breach of fiduciary duty [as escrow agent] immediately put Giga Watt [Wenatchee] in breach of the token purchase agreements which incorporated the terms of the White Paper, including, in particular, the Escrow requirements.

3-ER-395 ¶ 26; *see also, e.g.,* 3-ER-396 ¶ 28 (premature withdrawal of $10.8 million in escrowed token sale proceeds before requisite facilities had been built put GW Wenatchee "in breach of the WTT Token Sales Agreements").

Likewise, the Trustee claims that Perkins knowingly agreed to perform escrow duties that allegedly were incorporated into the Token Purchase Agreements. Specifically, because Perkins allegedly was aware of and knew the terms of the White Paper and of the Token Purchase Agreements, the Trustee claims that when Perkins agreed to act as escrow agent and accepted deposits of purchase proceeds into its IOLTA account, Perkins thereby agreed to perform the escrow terms that were incorporated into the Token Purchase Agreements. 3-ER-396:13-19; 4-ER-543:13-19. Thus, the Trustee's claims are not merely intertwined with the Token

35

Purchase Agreements but depend directly upon Perkins performing escrow duties allegedly incorporated into the Agreements.

Second, the Trustee claims that Perkins' performance of the terms of escrow was a critical component of how the Token Purchase Agreements were structured. Specifically, the Trustee alleges that purchases under the Token Purchase Agreements were not to be consummated—i.e., closing was not to occur—unless and until the requisite cryptomining hosting facilities sufficient to service issued tokens had been constructed. 3-ER-392-409 ¶¶ 18, 21, 26, 28, 42, 60; 4-ER-540 ¶ 21. According to the Trustee's allegations, a critical purpose of that condition was to avoid the tokens being treated as unregistered securities. 3-ER-409 ¶ 60. Therefore, Perkins' duties in performing the terms of escrow under the Token Purchase Agreements is alleged to have fundamentally affected the nature of the transaction itself and the legal characterization of the tokens sold under the Token Purchase Agreements. *See id.*

Third, because construction of sufficient hosting facilities was a term of the Token Purchase Agreements that had to be performed before purchases could close, Perkins' alleged obligation under the escrow agreement was to verify that performance had been completed before allowing the Token Purchase Agreement transactions to close by releasing the purchase proceeds. In other words, Perkins'

function as the escrow agent was an integral part of performance under the Token Purchase Agreements.

Specifically, the token purchase transactions allegedly could not close until Perkins decided, under the terms of escrow, whether GW Singapore had tendered full performance. It is because performance of the terms of escrow was part and parcel of performance of the Token Purchase Agreements that the Trustee alleges that Perkins' failure to verify that sufficient capacity had been constructed resulted in a "premature" closing. There can be no "premature" closing by release of token sale proceeds if performance under the escrow is not tied to performance and breach of the Token Purchase Agreements.

For the same reason, if Perkins' performance of the escrow was not intertwined with, and indeed necessary to, performance of the terms of the Token Purchase Agreements, then Perkins' conduct as escrow agent could not have caused a material breach of the Token Purchase Agreements—a breach that "immediately put Giga Watt [Wenatchee] in breach of the token purchase agreements." 3-ER-392-96 ¶¶ 19, 26, 28.

Fourth, the upshot of the Trustee's claims is that it may recover from Perkins the liability that GW Wenatchee allegedly has to token purchasers for breach of the Token Purchase Agreements. 3-ER-395-97 ¶¶ 26, 27, 28, 32.

Under these allegations, the Trustee's theory of the case and the claims against Perkins rise or fall on the terms, performance, and breach of the Token Purchase Agreements, and on the consequences of their alleged breach. It is not possible to separate the Trustee's escrow claims from Perkins' performance of duties that were incorporated into the Token Purchase Agreements.

Indeed, that the Trustee's claims are inherently intertwined with the terms, performance, and alleged breach of the Token Purchase Agreements necessarily follows under principles of escrow. An escrow is a sub-component of a separate, primary transaction between other principal parties; the escrow facilitates the principal parties' performance of the primary transaction—usually by facilitating the exchange of consideration between the principal parties and "closing" the transaction.

A deposit into escrow is nothing more than a "conditional delivery" by one principal party to the other principal party to the transaction, which the escrow agent holds and transfers to the other principal party to the transaction when the conditions of escrow are met. *Lechner v. Halling*, 216 P.2d 179, 185 (Wash. 1950). Consequently, the escrow is merely an agent of the principal parties to the transaction and, as their agent, facilitates the performance of the primary transaction. *See, e.g., Radach v. Prior*, 297 P.2d 605, 608 (Wash. 1956). Accordingly, an escrow

agent's duties are of necessity intertwined with performance of the primary transaction, the performance of which the escrow agent facilitates.

In short, under the facts as alleged by the Trustee, and under the agency law of escrow, the Trustee's claims are inextricably intertwined with the terms and performance of the Token Purchase Agreements.

> (c) **The Trustee may not assert rights under the Token Purchase Agreements by asserting that Perkins caused a breach of those Agreements resulting in liability and damages under those Agreements, without also being subject to all of the terms of those Agreements—including, specifically, that disputes arising from or relating to the Agreements be arbitrated in Singapore.**

Given these allegations, the Trustee is estopped to deny application of the arbitration provisions in the Token Purchase Agreements. "Equitable estoppel precludes a party from claiming the benefits of a contract while simultaneously attempting to avoid the burdens that contract imposes." *Setty*, 3 F.4th at 1169. But here, that is precisely what the Trustee is attempting to do. The Trustee relies on the rights of a party to the Token Purchase Agreements, GW Singapore, and purports to assert those rights on behalf of GW Wenatchee as the alleged partner of GW Singapore when helpful to the Trustee's claims. Yet, because of the burden allegedly involved, the Trustee simultaneously claims that GW Wenatchee is not bound to arbitrate as also required under the Token Purchase Agreements.

Thus, the Trustee, on behalf of GW Wenatchee, seeks to have it both ways: rely on and assert the terms of the Token Purchase Agreements as defining Perkins' duties and obligations when helpful, and yet avoid the alleged burden of the arbitration requirement by claiming that Perkins is not a party to the Token Purchase Agreements and, thus, cannot utilize defenses provided therein. This is exactly what equitable estoppel is intended to prevent.

That Perkins is not a signatory to the Token Purchase Agreements is irrelevant. The whole point of enforcement by estoppel is to permit a non-party to compel arbitration under a contract that is "intertwined" with the claims being asserted against the non-party. *Setty,* 3 F.4th 1168-69. Factually, this case is analogous to, but the circumstances are even stronger than, *Hughes Masonry,* 659 F.2d at 838-41, in which the Seventh Circuit compelled arbitration of claims against a construction manager who had been designated by two other parties, Hughes Masonry and Clark County, to act as manager under their construction contract. *See id.* at 837-38. Hughes asserted claims against J.A., who moved to compel arbitration under the Hughes-Clark construction agreement. *Id.* at 838. Hughes opposed arbitration on the grounds that J.A. was not a party to it.

Applying equitable estoppel, the Seventh Circuit compelled arbitration because, even though J.A. was not a party to the Hughes-Clark contract, "Hughes seeks in this action to hold J.A. responsible for its failure to perform (or its improper

performance of) the obligations set forth in the Hughes-Clark agreement." *Id*. at 839. The Court concluded that "Hughes is equitably estopped . . . because the very basis of Hughes' claim against J.A. is that J.A. breached the duties and responsibilities assigned and ascribed to J.A. by the agreement between Clark and Hughes," even though J.A. was not a party to that agreement. *Id*. at 838. Notably, the Seventh Circuit reasoned that it would be inequitable to allow Hughes to "have it both ways":

> Hughes has characterized its claims against J.A. as sounding in tort, i.e., intentional and negligent interference with contract. In substance, however, Hughes is attempting to hold J.A. to the terms of the Hughes-Clark agreement. Hughes' complaint is thus fundamentally grounded in J.A.'s alleged breach of the obligations assigned to it in the Hughes-Clark agreement. Therefore, we believe it would be manifestly inequitable to permit Hughes to both claim that J.A. is liable to Hughes for its failure to perform the contractual duties described in the Hughes-Clark agreement and at the same time deny that J.A. is a party to that agreement in order to avoid arbitration of claims clearly within the ambit of the arbitration clause. "In short, (plaintiff) cannot have it both ways. (It) cannot rely on the contract when it works to its advantage, and repudiate it when it works to (its) disadvantage." *Tepper Realty Co. v. Mosaic Tile Co.*, 259 F. Supp. 688, 692 (S.D.N.Y. 1966). *See also Avila Group, Inc. v. Norma J. of California*, 426 F. Supp. 537, 540 (S.D.N.Y. 1977) ("To allow (defendant) to claim the benefit of the contract and simultaneously avoid its burdens would both disregard equity and contravene the purposes underlying enactment of the Arbitration Act.").

*Hughes Masonry*, 659 F.2d at 838-39.

Here, as in *Hughes Masonry*, Perkins was allegedly designated to perform terms of escrow incorporated into the Token Purchase Agreements, but allegedly

failed to properly do so, causing a breach of the Token Purchase Agreements. Like the plaintiff in *Hughes Masonry,* the Trustee should be estopped from seeking to enforce and claim the benefit of the Token Purchase Agreements against Perkins, while simultaneously denying the burden—arbitration—also contained in those Agreements. The Trustee "cannot rely on the contract when it works to [his] advantage, and repudiate it when it works to [his] disadvantage." *Hughes Masonry*, 659 F.2d at 839.

Applying nearly identical equitable estoppel standards under state law, this Court has similarly compelled arbitration of claims against non-signatories when the alleged duties of or the substance of the claims against non-signatories are intertwined with a contract containing an arbitration clause. *See In re Pac. Fertility Ctr. Litig.*, 814 F. App'x at 209 (unpublished); *Franklin v. Cmty. Reg'l Med. Ctr.*, 998 F.3d at 876. Here, as described above, Perkins' alleged escrow duties, and the substance of the Trustee's claims against Perkins, are inextricably intertwined with the terms, performance, and breach of the Token Purchase Agreements, which contain an arbitration clause.

The Token Purchase Agreements expressly require that disputes arising from or relating to the Agreement must be arbitrated. Specifically, paragraph 15 waives the right to jury trial for disputes "arising from or related to" the Agreement and, instead, requires such disputes to be arbitrated in Singapore, before the Singapore

42

International Arbitration Centre. 3-ER-292-93 ¶¶ 15(a), (d). Arbitration clauses that include phrases like "relating to" are construed broadly and extend beyond disputes about the interpretation and performance of the contract itself. *Mediterranean Enters., Inc. v. Ssangyong Corp.,* 708 F.2d 1458, 1464 (9th Cir. 1983); *accord, e.g., Ege v. Express Messenger Sys., Inc.*, No. C16-1167RSL, 2017 WL 87841, at *5 (W.D. Wash. Jan. 10, 2017) (holding that statutory claims that "touch upon" matters in a contract containing an arbitration clause "relate to" that agreement and must be arbitrated), *aff'd*, 745 F. App'x 19 (9th Cir. 2018).

Accordingly, under ordinary principles of estoppel, arbitration of the Trustee's claims is required.

### 3. Ordinary Agency Principles Also Require Referral to Arbitration.

For similar reasons, Perkins may also enforce the arbitration terms of the Token Purchase Agreements as a non-signatory under ordinary principles of agency. *See Comer*, 436 F.3d at 1101. Here, under the Trustee's theory of liability, Perkins was acting as the agent of both GW Singapore and the token purchasers with respect to performance under the Agreements and, specifically, the terms under which proceeds of sale would be disbursed. *See Radach v. Prior*, 297 P.2d 605 (holding that an escrow is agent of both parties to the transaction and, upon performance of conditions, agent of one or the other). In the disbursement of sale proceeds, Perkins was acting ██████████████ its alleged principal, GW Singapore. The Trustee's

allegation is that ███████████ was improper, that Perkins did not independently verify performance under the Token Purchase Agreements was complete and, therefore, "prematurely" disbursed the proceeds of sale, thereby breaching the escrow terms contained in the Token Purchase Agreements.

In other words, all of Perkins' challenged conduct was taken as an agent of the principal parties to the Token Purchase Agreements, causing a breach by one principal party (the seller) and liability to the other principal party (the buyers). Where, as here, the claim is against a non-signatory agent of the principals who signed the arbitration agreement, and the claims arise out of the performance of the agreements, the non-signatory agent may enforce the agreement. *See Letizia*, 802 F.2d at 1188 (holding that non-signatory agents (employees) of securities broker were entitled to enforce arbitration agreement arising from their alleged wrongdoing in performing under brokerage account contract); *accord, e.g., Amisil Holdings,* 622 F. Supp. 2d at 840-41 (holding that non-signatories, as agents of signatory, may enforce agreement to arbitrate, where alleged wrongful conduct of non-signatories relates to performance of agreement and claims are "intertwined" with agreement).

Thus, under agency principles, in performing its duties as an agent to the parties to the Token Purchase Agreements, Perkins may rely on and enforce the terms of the Token Purchase Agreements, including the arbitration provisions. *See id*. Accordingly, arbitration was also required under ordinary agency principles.

**B.    The Bankruptcy Court Erred in Denying Perkins' Motion to Compel Arbitration, and the District Court Erred in Affirming that Decision.**

The Bankruptcy Court held that Perkins could not enforce the arbitration provisions in the Token Purchase Agreements because Perkins was not a party to them.  *See* 1-ER-29-30 ¶ 13; 1-ER-31 ¶ 3.  The District Court agreed and also held that because the arbitration clause in the Token Purchase Agreements was intended to cover disputes between token purchasers and GW Singapore related to the purchase of tokens, applying it to the escrow arrangement between GW Singapore and Perkins "would stretch the intent of the arbitration provision beyond its intended meaning."   1-ER-18:23-19:1.   In so holding, both courts failed to apply or erroneously applied principles of estoppel and agency.

First, in its order, the Bankruptcy Court did not address estoppel or agency principles at all.  The District Court likewise did not explain how Perkins' status as a non-signatory or whether the arbitration provisions in the Token Purchase Agreements were "meant" to cover Perkins, altered the estoppel or agency analysis. They do not.

As is explained above, equitable estoppel is a doctrine that operates to prevent the unfair advantage that parties gain by taking inconsistent positions.  Preventing a party from benefitting from inconsistent positions focuses on whether the positions are sufficiently inconsistent, not on the contractual status of the party being disadvantaged.  Critically, that Perkins is not a party to, nor identified in, the written

45

arbitration provision contained in the Token Purchase Agreements does not mean that the Perkins cannot enforce the arbitration provisions in them.  It is precisely because Perkins is not a signatory to the Token Purchase Agreements that Perkins moved to compel arbitration under estoppel and agency principles, under which non-parties may nevertheless enforce agreements to arbitrate.  If one could only enforce arbitration provisions by being a party to the contract, or by being expressly identified as a beneficiary of the arbitration clause, then arbitration could never be compelled under estoppel and agency principles.  But that is not the law.  Under principles of estoppel and agency, it is the type of dispute—one that is intertwined with, and in this case "related to," the Agreement—that matters, not whether the party seeking to enforce arbitration is a party to or named in the contract.

Next, regarding the District Court's conclusion that the arbitration provision is limited to disputes only between GW Singapore and token purchasers, no such limitation is found in the language of the arbitration provision.  The scope of the arbitration provision in the Token Purchase Agreements is defined by "Disputes," which is not limited to disputes between GW Singapore and purchasers.  The references to "Company" and "Purchaser" in the arbitration provision merely reiterate who is a party to the arbitration provision and in no way limits "Disputes," which defines the scope of the provision (as opposed to identifying who is entering into it), and is defined broadly to encompass any dispute "arising from or related to"

46

the Agreement, excepting only small claims or intellectual property disputes. 3-ER-292 ¶ 15(a).

To the extent the scope of the arbitration clause was in question, it requires arbitration of disputes "related to" the Token Purchase Agreements. As also discussed above, that term is broadly defined, and the Trustee's claims easily fall within the scope of it. *See Mediterranean,* 708 F.2d at 1464 ("relating to" is construed broadly and extends beyond disputes about the interpretation or performance of the contract itself).

Moreover, any doubt regarding the scope of the arbitration provision in the Token Purchase Agreements was required to be resolved in favor of, not against, arbitration. *See, e.g., Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ.,* 489 U.S. 468, 476 (1989) ("[D]ue regard must be given to the federal policy favoring arbitration, and ambiguities as to the scope of the arbitration clause itself resolved in favor of arbitration."); *Mundi*, 555 F.3d at 1044 (same).

Finally, the Bankruptcy Court also held that the alleged escrow arrangement was a separate, unwritten, or oral agreement between Perkins and GW Singapore that did not include an arbitration provision. S*ee* 1-ER-29-30 ¶¶ 13-15. The District Court likewise concluded that the escrow arrangement involved "an entirely different transaction" between a "different set of parties (Giga Watt Singapore and Perkins Coie)" and that "none of the terms" of the Token Purchase Agreements

"would even be relevant to the terms of the escrow arrangement." 1-ER-19:1-11. The Bankruptcy and District Courts' holdings that the alleged escrow agreement was unrelated to and not intertwined with the Token Purchase Agreements was error, whether reviewed under a de novo or abuse of discretion standard.

Specifically, in holding that the alleged escrow arrangement was separate from and unrelated to the Token Purchase Agreements, both courts improperly disregarded the allegations of the Trustee's Complaint. As discussed above, the Trustee's theory is that the escrow agreement is nothing more than Perkins' agreement to perform duties that were incorporated into and became enforceable under the Token Purchase Agreements, an allegation that the Trustee repeatedly asserts. 3-ER-389-404 ¶¶ 10, 18, 26, 42, 48. Rather than being separate and unrelated, the whole point of the escrow agreement was to bind Perkins to perform duties incorporated into the Token Purchase Agreements. Moreover, contrary to the characterization of the escrow as being a separate, unrelated transaction between only GW Singapore and Perkins, the Trustee expressly alleges that the token purchasers became a party to the escrow arrangement when they entered into the Token Purchase Agreements:

> Tokens were purchased through a "module" on Giga Watt's website which Cryptonomos created and controlled. Using "Smart Contracts," GW Singapore and token holders entered into the WTT Token Sales Agreements *which incorporated by reference the terms of the White Paper, including its escrow terms*.

48

3-ER-404 ¶ 48 (emphasis added); *see also* 3-ER-389-404 ¶¶ 10, 18, 26, 42, 48.

In addition, the release of purchase proceeds was allegedly "premature" under the escrow agreement *because performance under the Token Purchase Agreements (construction of facilities) had not yet been completed*. If breach of performance under the escrow agreement was not tied to performance under the Token Purchase Agreements, a breach of the escrow agreement could not cause a breach of the Token Purchase Agreements. That is true whether the escrow was incorporated into the Agreements or was separately agreed to. Therefore, whether separately agreed to or not, any escrow arrangement is inextricably intertwined with, and inseparable from, the Token Purchase Agreements that include the arbitration provisions.

These allegations by the Trustee are judicial admissions, conclusively binding on the Trustee, and cannot be disregarded. *See Hakopian*, 551 F.3d at 846 ("Allegations in a complaint are considered judicial admissions" and constitute undisputed facts.); *Am. Title*, 861 F.2d at 226 (holding that factual assertions in pleadings "are considered judicial admissions conclusively binding on the party who made them" including "before the trial court" and "on appeal"). In the face of the Trustee's contrary allegations, it was error of the Bankruptcy and District Courts to hold that the Token Purchase Agreements were solely between GW Singapore and the token purchasers and had nothing to do with Perkins or the alleged escrow agreement.

This is particularly so given that no traditional the escrow agreement exists and the Trustee has produced no other evidence regarding the terms of escrow agreement, other than those which the Trustee alleges were incorporated by reference from the White Paper into the Token Purchase Agreements. *See, e.g.,* 1-ER-29-30 ¶ 13; 1-ER-4:6-7 ("However, both parties agree that a traditional escrow document detailing the terms of the escrow agreement does not exist."). Without any other evidence before them and given that the allegations of the Trustee's Complaint are directly contrary to the Courts' conclusions, it was error for the Bankruptcy and District Courts to hold that the escrow agreement was separate from, and unrelated to the Token Purchase Agreements into which the escrow terms were allegedly incorporated. The Trustee's claims, therefore, are subject to arbitration.

In holding otherwise, the Bankruptcy and District Courts failed to discuss or correctly apply ordinary principles of estoppel or agency, improperly disregarded the allegations of the Trustee's Complaint, and reached the illogical and factually unsupported conclusion that the escrow was unrelated to the Token Purchase Agreements. This was error.

## VI. CONCLUSION

Because the Trustee asserts the rights of a signatory to the Token Purchase Agreements, and because the Trustee's claims are necessarily and inextricably intertwined with the terms, performance, and breach of the Token Purchase

Agreements, arbitration was required by the terms of the Agreements, and should have been (and should be) compelled. The Bankruptcy and District Courts erred when they concluded otherwise. The decisions of the courts below should be reversed with instructions to compel arbitration.

Respectfully submitted this 6th day of May, 2022.

BYRNES KELLER CROMWELL LLP

By /s/ *Bradley S. Keller*
Bradley S. Keller, WSBA #10665
By /s/ *Ralph E. Cromwell, Jr.*
Ralph E. Cromwell, Jr., WSBA #11784
By /s/ *Jofrey M. McWilliam*
Jofrey M. McWilliam, WSBA #28441

MUNDING, P.S.

By /s/ *John Munding*
John Munding, WSBA #21734

CARNEY BADLEY SPELLMAN, P.S.

By /s/ *Michael B. King*
Michael B. King, WSBA No. 14405
Jason W. Anderson, WSBA No. 30512

*Attorneys for Perkins Coie LLP and Lowell Ness*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)**  | 22-35104

I am the attorney or self-represented party.

**This brief contains** | 11,804 | **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

(•) complies with the word limit of Cir. R. 32-1.

( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

( ) is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one):*

    ( ) it is a joint brief submitted by separately represented parties;

    ( ) a party or parties are filing a single brief in response to multiple briefs; or

    ( ) a party or parties are filing a single brief in response to a longer joint brief.

( ) complies with the length limit designated by court order dated |                | .

( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ Jofrey M. McWilliam | **Date** | 05/06/2022

*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                               *Rev. 12/01/2018*

## CERTIFICATE OF SERVICE

I hereby certify that I caused to be electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on May 6, 2022.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

> Pamela Egan
> Potomac Law Group
> 1905 7th Avenue West
> Seattle, WA 98119-2815
> pegan@potomaclaw.com

Respectfully submitted this 6th day of May, 2022.

BYRNES KELLER CROMWELL LLP

By /s/ *Bradley S. Keller*
Bradley S. Keller, WSBA #10665
By /s/ *Ralph E. Cromwell, Jr.*
Ralph E. Cromwell, Jr., WSBA #11784
By /s/ *Jofrey M. McWilliam*
Jofrey M. McWilliam, WSBA #28441

MUNDING, P.S.

By /s/ *John Munding*
John Munding, WSBA #21734

CARNEY BADLEY SPELLMAN, P.S.

By /s/ *Michael B. King*
Michael B. King, WSBA No. 14405
Jason W. Anderson, WSBA No. 30512

*Attorneys for Perkins Coie LLP and Lowell Ness*

53