No. 22-35104

---

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

In re:  GIGA WATT, INC., a Washington corporation,

*Debtor.*

---

MARK D. WALDRON, Chapter 7 Trustee,

*Appellee,*

v.

PERKINS COIE LLP, a Washington limited liability partnership, and
LOWELL NESS, individual and California resident,

*Appellants,* and

GIGA WATT PTE., LTD., a Singapore corporation, and ANDREW
KUZENNY, a citizen of the Russian Federation,

*Defendants.*

---

APPEAL FROM UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON
No. 2:21-cv-00159-SAB; Honorable Stanley A. Bastian

---

**APPELLANTS' REPLY BRIEF**

---

Bradley S. Keller,
WSBA No. 10665
Ralph E. Cromwell, Jr.,
WSBA No. 11784
Jofrey M. McWilliam,
WSBA No. 28441
BYRNES KELLER
CROMWELL LLP
1000 Second Ave., Ste. 3800
Seattle, Washington  98104
Telephone: (206) 622-2000

John Munding,
WSBA No. 21734
MUNDING, P.S.
9425 N. Nevada St. Suite 212
Spokane, Washington  99218
Telephone:  (509)-624-6464

Michael B. King,
WSBA No. 14405
Jason W. Anderson,
WSBA No. 30512
CARNEY BADLEY
SPELLMAN, P.S.
701 Fifth Avenue, Suite 3600
Seattle, Washington  98104
Telephone: (206) 622-8020

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................... ii

I.     SUMMARY OF REPLY ARGUMENT ......................................................1

II.    REPLY ARGUMENT .......................................................................4

    A.    The Trustee Cannot Ignore, Much Less Disavow, the Allegations of His Complaint..........................................................................4

    B.    Arbitration Should Have Been Compelled Under Principles of Estoppel Because the Trustee's Claims Are Inextricably Intertwined With the WTT Token Purchase Agreements Which Contain the Arbitration Clause. . .....................................................................7

    C.    Arbitration Should Have Been Compelled Under Principles of Agency.................................................................................11

    D.    Federal Common Law Applies to the Issue of Arbitrability....................12

    E.    All of the Elements of the New York Convention Are Met. ...................17

    F.    The Specifics of Scott Glasscock's Claim in the Main Bankruptcy Proceeding Are Irrelevant.........................................................21

III.   CONCLUSION.............................................................................21

CERTIFICATE OF COMPLIANCE....................................................23

i

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*American Title Insurance Co. v. Lacelaw Corp.*,
  861 F.2d 224 (9th Cir. 1988) ................................................................. 7
*Amisil Holdings, Ltd. v. Clarion Capital Management*,
  622 F. Supp. 2d 825 (N.D. Cal. 2007) ...................................................... 12
*Casa del Caffe Vergnano S.P.A. v. ItalFlavors, LLC*,
  816 F.3d 1208 (9th Cir. 2016)..................................................... 13, 14, 15
*Certain Underwriters at Lloyd's London v. Argonaut Insurance Co.*,
  500 F.3d 571 (7th Cir. 2007)................................................................ 15
*Chelsea Family Pharmacy PLLC v. Medco Health Solutions, Inc.*,
  567 F.3d 1191 (10th Cir. 2009).............................................................. 5
*David Terry Investments, LLC-PRC v. Headwaters Development Group Ltd. Liab.
  Co.*, 463 P.3d 117 (Wash. Ct. App. 2020) ........................................... 15
*Doe v. Princess Cruise Lines, Ltd.*,
  657 F.3d 1204 (11th Cir. 2011)............................................................. 5
*GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA,
  LLC*, 140 S. Ct. 1637 (2020) .............................................................. 13
*Hakopian v. Mukasey*,
  551 F.3d 843 (9th Cir. 2008)............................................................... 7
*InterGen N.V. v. Grina*,
  344 F.3d 134 (1st Cir. 2003) .............................................................. 15
*Lechner v. Halling*,
  216 P.2d 179 (Wash. 1950).............................................................. 19
*Letizia v. Prudential Bache Securities, Inc.*,
  802 F.2d 1185 (9th Cir. 1986)........................................................ 12, 14
*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
  473 U.S. 614 (1985) ...................................................................... 5
*Padilla Ayala v. Teledyne Defense Electronics*,
  533 F. Supp. 3d 920 (C.D. Cal. 2021) ................................................ 20
*PowerAgent, Inc. v. Electronic Data Systems Corp.*,
  358 F.3d 1187 (9th Cir. 2004)............................................................ 6
*PowerAgent, Inc. v. United States District Court for the Northern District of
  California*, 210 F.3d 385, 2000 WL 32073 (9th Cir. 2000) ................... 6
*Radach v. Prior*,
  297 P.2d 605 (Wash. 1956).............................................................. 19

*Rogers v. Royal Caribbean Cruise Line*,
    547 F.3d 1148 (9th Cir. 2008) ............................................................. 20
*Satomi Owners Ass'n v. Satomi, LLC*,
    225 P.3d 213 (Wash. 2009) .................................................................. 16
*Setty v. Shrinivas Sugandhalaya LLP*,
    3 F.4th 1166 (9th Cir. 2021) ...................................................... Passim
*Simula, Inc., v. Autoliv, Inc.*,
    175 F.3d 716 (9th Cir. 1999) ................................................................. 5
*Smith/Enron Cogeneration Ltd. v. Smith Cogeneration International, Inc.*,
    198 F.3d 88 (2d Cir. 1999) .................................................................. 15
*Townsend v. Quadrant Corp.*,
    268 P.3d 917 (Wash. 2012) .................................................................. 16
*Woodall v. Avalon Care Center-Federal Way, LLC*,
    231 P.3d 1252 (Wash. Ct. App. 2010) ................................................. 16

## STATUTES

9 U.S.C. § 202 ....................................................................................... 20

## OTHER AUTHORITIES

Restatement (Third) of Trusts ¶¶ 2, 10 (2003) ...................................... 18

# I.     SUMMARY OF REPLY ARGUMENT

The Trustee's answering brief does not meaningfully address Perkins' entitlement to arbitration under either estoppel or agency theories.  In its Opening Brief, Perkins carefully explained that the Trustee's claims are intertwined with the performance and alleged breach of WTT Token Purchase Agreements ("TPAs") which contain arbitration clauses.  Indeed, it is hard to imagine how a claim could be more "intertwined with" a contract containing an arbitration clause than the claim actually plead by the Trustee: that the escrow provisions at issue were incorporated into the TPAs, that Perkins' failure to properly perform the escrow put the debtor in breach of the TPAs, and that the result was liability to the debtor under the TPAs, which the Trustee now seeks to recover from Perkins as damages.  The Trustee does not really argue otherwise and does not address the argument in the context of his Complaint.

Instead, to avoid arbitration, the Trustee ignores his own allegations and, contrary to his Complaint, now argues that any escrow agreement was entirely separate from the TPAs, that this separate escrow agreement did not contain its own arbitration provision, and thus that any breach of the "escrow" was independent from and not "intertwined with" the TPAs and the arbitration provisions they contain.  But there are no such allegations in the Trustee's Complaint.  Perkins' entitlement to arbitration turns on the allegations of the Complaint, not some new theory devised

1

to defeat arbitration. The Trustee may not defeat arbitration by simply ignoring the allegations of his own Complaint and asserting contrary positions that are not plead. *See* Opening Br. at 27, 47-49. Perkins repeatedly asserted in its briefing to the courts below that the Trustee was "bound" by his Complaint. 2-ER-40-41, 44-45, 243-245. Nonetheless, the Bankruptcy and District Courts erroneously ignored the Trustee's Complaint, acceding to the same incorrect argument that the Trustee makes to this Court.

Moreover, even if one were to accept, for purposes of argument, the Trustee's new theory that the only escrow provision at issue was in an agreement separate from the TPAs—the Trustee fails to explain how this would alter the arbitrability analysis. The question is not whether the "escrow" is somehow distinct from the TPAs, but whether the Trustee's *claims* are intertwined with the TPAs, which require arbitration. The Trustee's *claims* indisputably are intertwined with the TPAs. A core proposition of the Trustee's claims is that Perkins, as escrow agent, was duty-bound to monitor and enforce required performance under the TPAs and that, when Perkins released token purchase proceeds before completion of required performance under the TPAs, the result was to put GW Wenatchee (the debtor) into breach of the TPAs, causing liability, which the Trustee seeks to recover from Perkins. Thus, the Trustee's claim is not simply that Perkins breached a separate escrow undertaking and that is the end of the matter; rather, the Trustee's claim is

that Perkins' breach of that supposed separate escrow caused a breach of the TPAs for which GW Wenatchee allegedly is liable, and which the Trustee now seeks to recover from Perkins. As such, the Trustee's claims clearly depend upon the terms, performance, and alleged breach, of the TPAs. Accordingly, Perkins is entitled to avail itself of the arbitration provision in the TPAs.

In addition to ignoring his own allegations, the Trustee devotes considerable space to arguing facts and issues of marginal, if any, relevance. For example, the Trustee's brief discusses facts that go to the purported merits of the Trustee's claim rather than arbitrability. Likewise, the parties' briefing to, and the Bankruptcy and District Courts' decisions regarding, Perkins' right, in the alternative, to trial by jury is not before this Court. While Perkins disagrees with most of the Trustee's assertions in these regards, Perkins does not address those issues here as they are not material to arbitrability.

This Reply addresses the following issues raised by the Trustee's arguments: (a) the Trustee is not free to ignore, much less assert a position contrary to, the allegations of his Complaint; (b) under the allegations of the Trustee's Complaint, the Trustee's claims are inextricably intertwined with the TPAs and, therefore, arbitration should have been compelled; (c) arbitration is likewise required under principles of agency; (d) federal common law, not the law of Washington or Singapore, applies to the issue of arbitrability, although the same "intertwined with"

3

test applies and the same result obtains under Washington and federal law; (e) all of the elements of the New York Convention are met; and (f) the specifics of Scott Glasscock's claim in the main bankruptcy proceeding are irrelevant to arbitrability.

In sum, arbitration should have been compelled because the Trustee's claims are inextricably intertwined with the terms, performance, and alleged breach of the TPAs—contracts that contain a written arbitration clause.

## II.    REPLY ARGUMENT

### A.    The Trustee Cannot Ignore, Much Less Disavow, the Allegations of His Complaint.

It is undisputed that Perkins never entered into any written escrow agreement with any party, and that a written escrow agreement detailing the terms of escrow does not exist. The Bankruptcy Court so found. 1-ER-27, 29 (Findings of Fact Nos. 6, 9, 13); 2-ER-129. A key predicate of the Trustee's claim against Perkins, therefore, is that escrow terms were incorporated by reference into the TPAs from the so-called "White Paper," which then became binding on Perkins when it agreed to hold purchase proceeds in its IOLTA account on behalf of its client, GW Singapore. *See* 3-ER-389-404 ¶¶ 10, 18, 26, 28, 42, 48; 3-ER-413:18-22; 4-ER-543:13-19; 4-ER-560:18-22. *See also* Opening Br. at 13. That the terms of escrow were allegedly incorporated by reference into the TPAs is likewise the predicate of the Trustee's claim that, when Perkins failed to properly perform the terms of escrow, Perkins' conduct thereby put the debtor into breach of the TPAs, causing

4

liability on the part of the debtor under the TPAs to token purchasers—liability for which the Trustee seeks recovery from Perkins. 3-ER-395-97 ¶¶ 26, 27, 28, 31, 32.

To avoid arbitration, however, the Trustee argues a position directly contrary to the allegations of his Complaint: that he is not seeking to enforce the TPAs but is instead seeking to enforce an unwritten escrow agreement separate and distinct from, and therefore not intertwined with, the TPAs. *See* 1-ER-27 ¶ 5; Appellee's Br. at 11-12. But, and as Perkins repeatedly pointed out to the Courts below, Perkins' right to arbitration is determined by the allegations of the Trustee's Complaint, which are binding and cannot be ignored. 2-ER-40-41, 44-45, 243-245.

Specifically, in determining arbitrability federal courts "examine the factual allegations raised" in the complaint and whether those allegations "touch matters" encompassed within the scope of an agreement to arbitrate. *See, e.g., Simula, Inc., v. Autoliv, Inc.,* 175 F.3d 716, 721 (9th Cir. 1999). *See also*, *e.g., Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 624 n.13 (1985) (arbitrability determined based on allegations underlying the claims); *Doe v. Princess Cruise Lines, Ltd.*, 657 F.3d 1204, 1220 n.13 (11th Cir. 2011) (observing that courts measure the language of the arbitration provision against "the factual allegations in the complaint match[ed] up with the causes of the action asserted"); *Chelsea Fam. Pharmacy PLLC v. Medco Health Sols., Inc.*, 567 F.3d 1191, 1194 (10th Cir. 2009)

(stating that it is necessary to look at the substance of the factual allegations in the complaint to determine arbitrability, not legal labels).

Because a complaint's allegations bear directly on arbitrability, this Court has held that where the allegations require arbitration, and where arbitration has been ordered, a plaintiff may not amend the complaint to circumvent a previously issued order compelling arbitration, as this would allow every order compelling arbitration to become, "merely provisional." *PowerAgent, Inc. v. Elec. Data Sys. Corp.*, 358 F.3d 1187, 1190 (9th Cir. 2004) (citing *PowerAgent, Inc. v. U.S. Dist. Ct. for the N. Dist. of Cal.*, 210 F.3d 385, 2000 WL 32073 at *2 (9th Cir. 2000) (unpublished)).

That arbitrability is determined based on the complaint is true not only where the court is analyzing whether the claims fall within the scope of an arbitration clause, but also where the court is determining whether to compel arbitration under estoppel principles. *See Setty v. Shrinivas Sugandhalaya LLP,* 3 F.4th 1166, 1169 (9th Cir. 2021) (concluding that "the allegations here do not implicate the agreement that contained the arbitration clause—a prerequisite for compelling arbitration under the equitable estoppel framework").

Thus, and as set forth in Perkins' Opening Brief, the allegations of the Trustee's Complaint cannot be ignored, much less disavowed, but are binding upon the Trustee, and the courts below, when analyzing whether arbitration must be

compelled. *See* Opening Br. at 27, 49 (discussing *Hakopian v. Mukasey*, 551 F.3d 843, 846 (9th Cir. 2008) (holding that "[a]llegations in a complaint are considered judicial admissions" and constitute undisputed facts) and *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988) (holding that factual assertions in pleadings "are considered judicial admissions conclusively binding on the party who made them" including "before the trial court" and "on appeal")).

**B. Arbitration Should Have Been Compelled Under Estoppel Principles Because the Trustee's Claims Are Inextricably Intertwined With the WTT Token Purchase Agreements, Which Contain the Arbitration Clause.**

Turning to the allegations of the Trustee's Complaint, his claims are clearly intertwined with the terms, conditions, and performance of the TPAs, which contain broad arbitration provisions. *See* Opening Br. at 11-16, 23-25, 34-37 (citing to the Complaint). To reiterate, the Trustee's Complaint alleges that the TPAs incorporate escrow terms from the White Paper:

> According to the White Paper, which describes the Giga Watt Project in detail, and whose provisions were *incorporated by reference* into the token purchase agreements, all token sale proceeds would be held in escrow until Giga Watt met certain milestones in constructing the new facilities.

3-ER-392 ¶18 (emphasis added). *See also* 3-ER-389-404 ¶¶ 10, 26, 28, 42, 48.

Because the escrow terms were incorporated into the TPAs, the Trustee's Complaint specifically alleges that Perkins' alleged breach of its duties as escrow agent put the debtor (GW Wenatchee) into breach of the TPAs:

7

Perkins Coie's breach of fiduciary duty immediately put Giga Watt in breach of the token purchase agreements which *incorporated the terms of the White Paper*, including, in particular, the Escrow requirements.

3-ER-395 ¶ 26. *See also* 3-ER-395-97 ¶¶ 27, 28, 31, 32.

Moreover, contrary to his current characterization of the escrow as being a separate, unrelated agreement between only GW Singapore and Perkins, the Trustee's Complaint alleges that the token purchasers also became party to the escrow arrangement when they entered into the TPAs:

Tokens were purchased through a "module" on Giga Watt's website which Cryptonomos created and controlled. Using "Smart Contracts," GW Singapore and the token holders entered into the WTT Token Sales Agreements *which incorporated by reference the terms of the White Paper, including its escrow terms*.

3-ER-404 ¶ 48 (emphasis added); *see also* 3-ER-389-401 ¶¶ 10, 18, 26, 42.

Finally, the Trustee's Complaint alleges that a result of the debtor being put into breach of the TPAs is that it became liable for the escrowed funds prematurely released by Perkins:

Therefore, when Perkins violated the Escrow and disbursed Escrow funds before capacity was built out, Giga Watt immediately became liable . . . .

3-ER-412 ¶ 72 (redacted); 4-ER-559 ¶ 72 (under seal). *See also* 3-ER-391-92 ¶ 17, 395-97 ¶¶ 26, 27, 28, 31, 32.

These allegations could not be more clear or specific. The Trustee claims that Perkins agreed to act as an escrow agent under an escrow provision that was

8

incorporated into the TPAs, and that when Perkins failed to properly perform its duties, the result was to put the debtor in breach of the TPAs, causing it to become liable under the TPAs to token purchasers for prematurely released token purchase proceeds. Perkins' entitlement to arbitration is determined based on these allegations.

Although these allegations and their effect were discussed at length in Perkins' Opening Brief, the Trustee makes no meaningful attempt to explain why the claims based on those allegations are not intertwined with the TPAs. *See* Opening Br. at 11-16, 23-25, 34-42. Instead, ignoring his own allegations, the Trustee argues that there is no arbitration provision in what he now asserts was a separate escrow agreement, such that a breach of the escrow has nothing to do with the TPAs. Appellee's Br. at 15-17.

In addition, the Trustee fails to explain how treating the escrow as a standalone agreement would alter the analysis or the outcome on whether arbitration should have been compelled. It would not. The issue is not whether the escrow is somehow a separate, standalone agreement, but whether the Trustee's claims are "intertwined with" the TPAs containing the arbitration clause. The Trustee's claims indisputably are inextricably intertwined with the TPAs even assuming a separate escrow agreement between only Perkins and GW Singapore.

In this regard, a core tenet of the Trustee's claims is that the TPAs required construction of sufficient capacity before the purchase of corresponding tokens could close and token purchase proceeds could be released to the seller, GW Singapore. 3-ER-392-99 ¶¶ 18, 21, 23, 38; 3-ER-400-01 ¶ 42; 3-ER-404 ¶ 48; 3-ER 412 ¶ 71. Accordingly, the Trustee claims that, as escrow agent, Perkins was required to monitor and confirm completion of the performance required under the TPAs before it could release the proceeds of sale it was holding. *See id*; 4-ER-559 ¶ 71; 4-ER-560-61 ¶ 79. Thus, establishing the terms and conditions of the TPAs, and the precise performance that was required before a purchase could close and proceeds could be released under the TPAs, is fundamental to the Trustee's claims.

Another core proposition of the Trustee's claims is that Perkins failed to verify the status of performance under the TPAs, 4-ER-540-41, 559-60 ¶¶ 21, 23, 71, 79, that the performance required under the TPAs had not been completed, *id.,* and that Perkins' release of certain proceeds of sale was therefore "premature" under the TPAs, causing a breach of the TPAs. 3-ER-395-97 ¶¶ 26, 27, 28, 32. The Trustee claims that, as a result, Perkins' conduct as the escrow agent put the debtor, GW Wenatchee, into breach of the TPAs. Thus, performance and breach under the TPAs, and whether Perkins' release of token purchase proceeds was "premature" and caused the debtor to be in breach of the TPAs, are necessary elements of the Trustee's claim.

10

Finally, the Trustee claims Perkins' conduct injured the debtor in that the debtor became liable to the token purchasers for breach of the TPAs in the amount of the token purchase proceeds that Perkins allegedly prematurely released. 3-ER-395-97 ¶¶ 26, 27, 28, 32. Thus, the damage claimed by the Trustee is the consideration paid by the token purchasers under the TPAs that was allegedly prematurely released, and for which the debtor is purportedly liable to the token purchasers—liability for breach of the TPAs that the debtor now seeks to recover from Perkins.

Thus, even if the "escrow" were somehow a separate, standalone agreement, the Trustee's claims are still dependent on and closely intertwined with the terms, performance, and breach of, and the purported liability to token purchasers under the TPAs, which contain the arbitration provisions. The Trustee offers no argument to the contrary. It was error for the Bankruptcy and District Courts to disregard the Trustee's own allegations and reach conclusions directly contrary to those allegations—an error that the Trustee, in its briefing to this Court, continues to propagate without explanation or authority.

## C. Arbitration Should Have Been Compelled Under Principles of Agency.

Perkins also argued in its Opening Brief that arbitration should also have been compelled under agency principles. In response, the Trustee offers no argument or authority to the contrary. To briefly reiterate, to the extent Perkins acted as an

escrow agent, it necessarily did so as an agent to the principal parties to the TPAs. *See* Opening Br. at 38-39, 43-44 (discussing facts and authorities). Indeed, if Perkins' performance as escrow was not as an agent of the parties under the TPAs, then Perkins' conduct could not have caused a breach of, nor resulted in the debtor's liability under the TPAs, as alleged by the Trustee. Where the claims and alleged wrongdoing relate to performance under or intertwined with a contract containing an arbitration clause, the agent is entitled to compel arbitration even though it is not a signatory to the agreement. *See, e.g., Letizia v. Prudential Bache Secs., Inc.*, 802 F.2d 1185, 1188 (9th Cir. 1986) (holding that non-signatory agents of securities broker were entitled to enforce arbitration agreement arising from their alleged wrongdoing in performing under brokerage account contract); *Amisil Holdings, Ltd. v. Clarion Cap. Mgmt.,* 622 F. Supp. 2d 825, 840-41 (N.D. Cal. 2007) (holding that non-signatories, as agents of signatory, may enforce agreement to arbitrate where alleged wrongful conduct of non-signatories relates to performance of agreement and claims are "intertwined" with agreement). The Trustee does not address these principles and does not explain why arbitration should not be compelled under them.

## D. Federal Common Law Applies to the Issue of Arbitrability.

The Trustee asserts that the law of Washington, or in the alternative the law of Singapore, applies to determine whether arbitration should have been compelled. Each argument is addressed in turn.

As an initial matter, both federal authorities and Washington authorities were argued to Courts below. *See* 2-ER-41, 36-37, 139, 244; 3-ER-349-50. Moreover, Washington applies the same test as federal common law ("intertwined with") to compelling arbitration by estoppel. *See id*.; *see also infra.* Therefore, the Trustee's argument regarding Washington law is a distinction without a difference. Nevertheless, federal law and not the law of Washington appears to apply here under this Court's decision in *Setty*. *See* 3 F.4th at 1168 (applying federal law to determination of arbitration by estoppel under the New York Convention). *See also, e.g., Casa del Caffe Vergnano S.P.A. v. ItalFlavors, LLC,* 816 F.3d 1208, 1211 (9th Cir. 2016) (applying federal common law under section 2 of FAA, which implements the New York Convention).

At the time Perkins moved the Bankruptcy Court to compel arbitration, *Setty* had not yet been decided. Meanwhile, the United States Supreme Court left open the question of which body of domestic law would apply to determine arbitrability under the New York Convention. *See GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 140 S. Ct. 1637, 1648 (2020) (remanding without deciding the "body of law" that applied to determine enforcement of arbitration by estoppel under the New York Convention). As such, Perkins briefed both Washington and federal authorities to the Bankruptcy and District Courts below. *See* 2-ER-41, 36-37, 139, 244; 3-ER-349-50.

13

After the Bankruptcy Court denied Perkins' Motion to Compel Arbitration, this Court's decision in *Setty* was issued. *Setty* holds that, in cases involving the New York Convention, in determining the arbitrability of federal claims by or against non-signatories to an arbitration agreement, this Court applies "'federal substantive law', for which we look to 'ordinary contract and agency principles.'" 3 F.4th at 1168 (quoting *Letizia*, 802 F.2d at 1187). *See also, e.g., Casa del Caffe*, 816 F.3d at 1211 (concluding that because the case "arises under Chapter 2 of the Federal Arbitration Act [implementing the New York Convention], the issue of whether the Commercial Contract constituted a binding agreement is governed by federal common law").

The Trustee's argument that arbitrability should be determined under Washington law in this case appears to rely on this Court's statement, in *Setty*, that federal common law applies to determine the arbitrability of "federal claims" against non-signatories. *See* 3 F.4th at 1168. However, whether a plaintiff asserts federal or state law claims does not appear to be the dispositive factor in determining whether federal or state law applies to arbitrability under the New York Convention. Rather, the need for uniformity of law under the New York Convention appears to be the primary factor requiring the application of federal law. This is consistent with *Setty*, which observes that the New York Convention and its implementing legislation "emphasize the need for uniformity in the application of international

14

arbitration agreements." *Setty*, 3 F.4th at 1168 (quoting *Certain Underwriters at Lloyd's London v. Argonaut Ins. Co.*, 500 F.3d 571, 580-81 (7th Cir. 2007) for the proposition that "uniformity of law is of *paramount* importance" "in the context of the New York Convention"). *See also, e.g., Certain Underwriters*, 500 F.3d at 579 (rejecting application of state law and applying federal common law to contract interpretation under the New York Convention); *InterGen N.V. v. Grina*, 344 F.3d 134, 143–44 (1st Cir. 2003) (applying federal common law because "varying state standards in cases falling within the Convention's ambit would be in tension with the elemental purpose of chapter 2" of the FAA); *Smith/Enron Cogeneration Ltd. v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88, 96 (2d Cir. 1999) (concluding that there are compelling reasons to apply federal common law under the New York Convention). *See also, e.g., Casa del Caffe*, 816 F.3d at 1211 (federal common law applies to cases that arise under chapter 2 of the FAA (which implements the New York Convention)).

However, even if Washington law applied, it was argued to the Courts below and the result would be the same. Like federal common law, Washington law requires arbitration of claims against non-signatories where the claims are "intertwined with" the contract that contains the arbitration clause. *See David Terry Invs., LLC-PRC v. Headwaters Dev. Grp. Ltd. Liab. Co.*, 463 P.3d 117, 124 (Wash. Ct. App. 2020) (applying estoppel and observing that under an estoppel analysis

courts look in particular at "whether the claims that the non-signatory sought to arbitrate were intimately founded in and intertwined with the underlying contract obligations").[1]  Indeed, Washington law essentially follows federal law regarding equitable estoppel and other common law grounds on which to enforce arbitration clauses.  *See, e.g., Townsend v. Quadrant Corp.*, 268 P.3d 917, 922 (Wash. 2012) (citing Ninth Circuit authorities for the proposition that an arbitration clause may be enforced under the doctrine of equitable estoppel); *Satomi Owners Ass'n v. Satomi, LLC*, 225 P.3d 213, 230 n.22 (Wash. 2009) (same); *Woodall v. Avalon Care Ctr.-Fed. Way, LLC*, 231 P.3d 1252, 1254 (Wash. Ct. App. 2010) (same).

The Trustee's alternate argument that Singapore law applies was not made below.  Moreover, application of Singapore law is foreclosed by *Setty*.  The Trustee's argument that Singapore law applies is apparently based on the choice-of-law clause in the TPAs, which selects the law of Singapore to govern the contract.  *See* 3-ER-292 ¶14.  In *Setty,* however, this Court held that whether a non-signatory may enforce an arbitration agreement "is a 'threshold issue' for which we do not look to the agreement itself."  3 F.4th at 1168.  In so holding, the Court expressly rejected

---

[1] It bears reiterating that the Trustee alleges that the rights and liabilities of GW Singapore and the debtor, GW Wenatchee, are one and the same, and that the debtor may enforce, and is liable under, any agreement that GW Singapore entered into as a partner of the "Giga Watt Project."  *E.g.*, 3-ER-392:17-19; Opening Br. at 15, 23, 32-33.  Thus, the Trustee asserts the rights and liabilities of a signatory to the TPAs (GW Singapore) against a non-signatory (Perkins).

the same argument made by the Trustee here—that the choice-of-law clause in the contract containing the arbitration clause should apply to determine arbitrability under the New York Convention. *See id.*

While the Trustee's legal analysis as to the applicability of Singapore law is incorrect, the Trustee's position that the choice-of-law clause in the TPAs applies to determine arbitrability appears to be a tacit admission that his claims are "intertwined with" the TPAs, which also contain the arbitration clause. *See* 3-ER-292-93 ¶¶ 14, 15.

**E.     All Elements of the New York Convention Are Met.**

As set forth in Perkins' Opening Brief (and Perkins' briefing to the underlying Courts), all of the elements of the New York Convention are met. *See* Opening Br. at 18-19; 3-ER 345-52. The only element the Trustee challenges is whether the transaction is "commercial" in nature. In arguing that it is not, the Trustee focuses exclusively on the fiduciary nature of an escrow agent's obligations. From this, the Trustee claims that an escrow is a "trust" and that a trust cannot be commercial in nature. The Trustee cites no authority for this proposition, and his own allegations foreclose the argument.

As an initial matter, it is hard to imagine how the underlying transaction can be characterized as anything other than commercial. GW Singapore set out to sell $30 million of tokens via the internet to thousands of people all over the world. It

17

touted the tokens as a means to access low electrical rates in Eastern Washington to facilitate cryptomining. The White Paper, used to market the tokens, contained detailed projections about the economics of cryptomining and the savings that could be achieved by purchasing tokens. How can a sale of millions of dollars of tokens to people who hope to profit from cryptomining not be a commercial transaction?

Moreover, the Trustee's unsupported "trust" argument stretches the nature of an escrow too far. That agency relationships create fiduciary obligations does not mean agency relationships are trusts and an agent a trustee. The distinguishing characteristic of a trust is that the trustee takes ownership of and title to trust property—title that is granted by a trustor to the trustee for the benefit of another (the beneficiary). *See, e.g.,* Restatement (Third) of Trusts ¶¶ 2, 10 (2003). In addition, implicit in the Trustee's argument, which is unsupported by citation to authority, is that "trusts" can never be commercial in nature. However, some trust relationships certainly may be commercial in nature (an example might be ownership "in trust" of property by a lender to secure a loan). On the other hand, a personal or family trust would ordinarily not be intended to facilitate a commercial transaction. It is this personal or family type trust to which the Trustee apparently likens the escrow in this case. The Trustee provides no basis in fact or law to support this argument.

First, unlike a personal or family trust, an escrow generally facilitates a commercial transaction. Under the facts as alleged by the Trustee, that is certainly the case here. Moreover, while an escrow agent may owe fiduciary duties to its principals, unlike a trustee, an escrow agent does not take ownership of and title to trust property granted by one (the trustor) for the benefit of another (the beneficiary). Rather, a deposit into escrow is nothing more than a "conditional delivery" by one principal party to the other principal party to a (commercial) transaction, which the escrow agent holds and transfers to the other principal party to the transaction when the conditions of the transaction are met. *Lechner v. Halling*, 216 P.2d 179, 185 (Wash. 1950). The escrow is merely an agent of the principal parties to the transaction and, as their agent, facilitates the performance of the transaction. *See, e.g., Radach v. Prior*, 297 P.2d 605, 608 (Wash. 1956). Again, as alleged by the Trustee, that was the case here. Perkins' alleged role as escrow for the parties to the TPAs was to facilitate the completion and closing of the transaction. Perkins allegedly took a "conditional delivery" of consideration (purchase proceeds) from the buyers and delivered them to the seller.

The notion, therefore, that a non-commercial "trust" was formed is without support in the facts or the law. Indeed, if such a trust had been formed, the Trustee would have no claim because Perkins' alleged premature release of purchase proceeds would not have caused a breach of the TPAs (which are not trust

19

documents), and the debtor, as the purported beneficiary of the trust, would have no liability to the token purchasers for a breach of trust by the alleged trustee (Perkins). The Trustee's argument, once again, shows his willingness to stray far afield from the facts of the case and the allegations of his Complaint.

More to the point, under the New York Convention, it is the commercial nature of the contract that contains the arbitration clause that must be considered; and in determining whether that contract evidences a transaction "involving commerce," the term "commerce" is construed broadly to encompass the full reach of Congress's Commerce Clause powers. *See* 9 U.S.C. § 202; *Rogers v. Royal Caribbean Cruise Line*, 547 F.3d 1148, 1154 (9th Cir. 2008) (discussing "evidencing a transaction" and "involving commerce" under the New York Convention as implemented in section 2 of the FAA); *Padilla Ayala v. Teledyne Def. Elecs.*, 533 F. Supp. 3d 920, 925–26 (C.D. Cal. 2021) (same).

As discussed above, the transaction here easily meets the definition. Indeed, under the allegations of the Trustee's own Complaint, the alleged escrow was the mechanism by which the token purchase transactions were facilitated and closed. Thus, whether characterized as an "escrow" or as a "trust," the transaction was indisputably commercial in nature within the meaning of the New York Convention and Perkins' alleged role was to facilitate that transaction.

**F.    The Specifics of Scott Glasscock's Claim in the Main Bankruptcy Proceeding Are Irrelevant.**

Finally, the Trustee argues the specifics of Scott Glasscock's creditor's claim in the main bankruptcy proceeding.  However, the specifics of that claim are irrelevant to arbitrability.  Scott Glasscock's WTT Token Purchase Agreement is in the record as evidence of the terms of the TPAs generally.  Indeed, the Trustee himself admittedly asserts and relies on the Glasscock WTT Token Purchase Agreement as evidencing the terms of token purchase, including that the terms of escrow were allegedly incorporated by reference into the TPAs.  *See* Opening Br. at 12-13; Appellee's Br. at 12; 2-ER-81, 129-30, 262.  But the specifics of Mr. Glascock's creditor's claim in the main bankruptcy have no bearing on arbitrability, and the Trustee provides no explanation of how they would.

## III.    CONCLUSION

Because the Trustee purports to have and asserts the rights of a signatory to the TPAs, because neither the Trustee nor the Bankruptcy and District Courts may ignore the allegations in the Trustee's Complaint, and because the Trustee's claims are necessarily and inextricably intertwined with the terms, performance, and breach of the TPAs, arbitration was required by the terms of the TPAs, and should have been (and should be) compelled.  The Bankruptcy and District Courts erred when they concluded otherwise.  For these reasons, the decisions of the Courts below should be reversed with instructions to compel arbitration.

21

Respectfully submitted this 26th day of August 2022.

BYRNES KELLER CROMWELL LLP                    CARNEY BADLEY SPELLMAN, P.S.

By /s/ *Bradley S. Keller*      By /s/ *Michael B. King*
Bradley S. Keller, WSBA #10665   Michael B. King, WSBA # 14405
By /s/ *Ralph E. Cromwell, Jr.*    Jason W. Anderson, WSBA # 30512
Ralph E. Cromwell, Jr., WSBA #11784
By /s/ *Jofrey M. McWilliam*
Jofrey M. McWilliam, WSBA #28441

MUNDING, P.S.

By /s/ *John Munding*
John Munding, WSBA #21734

*Attorneys for Perkins Coie LLP and Lowell Ness*

## CERTIFICATE OF COMPLIANCE

Under Federal Rules of Appellate Procedure 29(d) and 32(a)(7)(C), I certify that this brief is proportionately spaced with one-inch margins on all four corners with a total of 5,132 words.

Respectfully submitted this 26th day of August, 2022.

BYRNES KELLER CROMWELL LLP

By /s/ *Bradley S. Keller*
Bradley S. Keller, WSBA #10665
By /s/ *Ralph E. Cromwell, Jr.*
Ralph E. Cromwell, Jr., WSBA #11784
By /s/ *Jofrey M. McWilliam*
Jofrey M. McWilliam, WSBA #28441

MUNDING, P.S.

By /s/ *John Munding*
John Munding, WSBA #21734

CARNEY BADLEY SPELLMAN, P.S.

By /s/ *Michael B. King*
Michael B. King, WSBA # 14405
Jason W. Anderson, WSBA # 30512

*Attorneys for Perkins Coie LLP and Lowell Ness*

23

## CERTIFICATE OF SERVICE

I hereby certify that I caused to be electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on August 26, 2022.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Pamela Egan
Potomac Law Group
1905 7th Avenue West
Seattle, WA 98119-2815
pegan@potomaclaw.com

Respectfully submitted this 26th day of August, 2022.

BYRNES KELLER CROMWELL LLP

By /s/ *Bradley S. Keller*
Bradley S. Keller, WSBA #10665
By /s/ *Ralph E. Cromwell, Jr.*
Ralph E. Cromwell, Jr., WSBA #11784
By /s/ *Jofrey M. McWilliam*
Jofrey M. McWilliam, WSBA #28441

MUNDING, P.S.

By /s/ *John Munding*
John Munding, WSBA #21734

CARNEY BADLEY SPELLMAN, P.S.

By /s/ *Michael B. King*
Michael B. King, WSBA # 14405
Jason W. Anderson, WSBA # 30512

*Attorneys for Perkins Coie LLP and Lowell Ness*

24